[No. H016348. Sixth Dist. Mar. 6, 1998.]

JAMES B. BARTON, Plaintiff and Appellant, v.
ELEXSYS INTERNATIONAL, INC., et al., Defendants and Respondents.

**COUNSEL**

Sweeney, Mason & Wilson and Kurt E. Wilson for Plaintiff and Appellant.

Cooley Godward, Daniel P. Westman, Molly Brown Forstall and Gregory C. Tenhoff for Defendants and Respondents.

## OPINION

**COTTLE, P. J.**—In September 1994, defendant Elexsys International, Inc., a manufacturer of integrated circuit boards, was in the midst of a financial crisis. Its stock had plummeted in value, to $1.31 per share, and its cash reserves were almost depleted. To save the company, Elexsys's major shareholder engineered a restructuring of the company, which eliminated the senior vice-president position held by plaintiff James B. Barton. Elexsys continued Barton's $200,000 salary and benefits, however, for 12 months pursuant to its "Executive Salary Continuance Plan."

A year later, the company's fortunes had turned around. When Elexsys's stock had risen to $15.31 per share, Barton attempted to exercise stock options he had been granted to purchase stock at $1.25 and $3.50 per share. Elexsys refused his tender, explaining to Barton that his options had lapsed and were no longer exercisable.

Barton sued for breach of contract and fraud. After conducting discovery, Elexsys moved for summary judgment, supporting its motion with the three written stock option agreements upon which Barton was relying. All provided that the options would no longer vest once Barton's employment was terminated. The two most favorable to Barton provided that he could exercise his options no later that thirty days after his termination. The trial court granted Elexsys's motion. On appeal, Barton contends he submitted evidence creating a triable issue of fact as to whether the executive salary continuation plan included stock options. We disagree and therefore affirm the judgment.

### FACTS

Barton was hired by Diceon Electronics, Inc., now known as Elexsys, on October 1, 1992, as a senior vice-president and general manager of subsidiary Symtron Corporation. At the time, Elexsys's president and chief executive officer (CEO) was defendant Peter Jonas.

On October 9, 1992, Barton was granted the first of three stock options. The October 9, 1992, written stock option agreement provided that "[t]he option term specified in Paragraph 2 hereof shall terminate prior to its Expiration Time . . . . Should Optionee's employment with the Corporation or its subsidiaries terminate at any time for any reason other than by reason of death or disability during the option term, Optionee shall have the right to exercise this option within thirty (30) days of the date of Optionee's termination of employment, but only with respect to that number of Optioned

Shares (if any) for which the option is exercisable on the date that Optionee terminates employment."

On September 9, 1993, Barton was granted the second of his three stock options. The September 9, 1993, written stock option agreement provided that "[t]he option term specified in Paragraph 2 shall terminate prior to the Expiration Date . . . . Should Optionee cease to be an employee of the Corporation or its subsidiaries for any reason or cause, whether or not meritorious (other than by reason of disability or death) at any time during the option term, then this option shall immediately terminate and cease to be exercisable."[1]

On November 11, 1993, Barton was granted the third of his stock options. The termination provisions in this agreement were identical to the provisions in the October 9, 1992, agreement (i.e., giving Barton the right to exercise options that were vested on the date of his termination from employment no later than 30 days after the termination).

In his deposition, Barton testified that he read and understood each of the three stock option agreements when he signed them. As to the September 9, 1993, agreement, Barton understood that the options granted would not vest, and could not be exercised, after the termination of his employment. As to the two other agreements, Barton testified that he understood his options would not vest after the termination of his employment, and he would have only 30 days after his termination to exercise any vested options. Finally, Barton testified that the three stock option agreements were the only agreements between him and Elexsys regarding his stock option grant.

In late 1993, Elexsys was, as noted earlier, in severe financial distress. Fearing that some Elexsys executives might need to be involuntarily terminated without cause by the company, CEO Jonas got approval from the board of directors to provide severance agreements for each of the company's executives. Different packages were given to different executives and collectively these agreements were called the "Executive Salary Continuance Plan."

Barton's severance agreement, dated December 22, 1993, provided: "In the event your employment is terminated without cause by the Company,

---

[1]The September 9, 1993, agreement incorporated by reference the "Diceon Electronics, Inc. Employee Stock Option Plan (1983)," which provided, in pertinent part: "Should an Optionee cease to be an employee of the Corporation or its subsidiaries for any reason or cause, whether or not meritorious (other than by reason of disability or death) at any time during the option term, then any and all options granted hereunder to Optionee shall immediately terminate and cease to be exercisable."

you will receive monthly payments equal to your monthly salary at the time of termination for twelve (12) months or until earlier reemployment. . . . [¶] This agreement replaces and supersedes any prior executive salary continuance or severance arrangement. . . . [¶] Exceptions to the above require the written approval of the President/C.E.O." The severance agreement made no mention of stock options.

Barton testified in his deposition that he read, understood, and accepted the severance agreement and that it did not change his understanding that his stock options would terminate pursuant to the terms in the stock option agreements.

In June 1994, Milan Mandaric acquired a significant percentage of Elexsys's stock. Mandaric was told at that time that the company had approximately 45 days of operating capital left before it would have to shut down permanently. To save the company, he engineered a restructuring, which resulted, among other things, in the elimination of Barton's position.

On September 21, 1994, Jonas notified Barton that his position had been eliminated. Barton subsequently resigned, effective September 30, 1994. Neither Jonas nor Mandaric told Barton that his stock options would continue to vest or that he would be able to exercise them after his termination.

At the time Barton left Elexsys, Elexsys's stock was selling at $1.31 per share. Barton's stock options gave him the right to purchase some shares for $3.50 per share and others for $1.25 per share. Barton did not exercise the options that had vested on the date of his termination (September 30, 1994), presumably because the stock was available on the market for a price lower than the $3.50 option price and approximately the same as the $1.25 option price.

In February 1995, when Elexsys's stock had risen to $5.37 per share, Barton called Michael Shimada, Elexsys's chief financial officer, and asked about exercising some of his stock options. He was told the options could no longer be exercised. On September 28, 1995, when the stock had risen to $15.31 per share, Barton attempted once again to exercise his options. This time he did it in writing, and included a check for more than $113,000. Shimada responded by mail, returning Barton's check and informing him that the options had lapsed and were no longer exercisable.

In November 1995, Barton filed suit against Elexsys, Jonas, and Mandaric, alleging breach of contract, fraud and negligent misrepresentation.[2] When defendants moved for summary judgment, Barton opposed their motion with his own declaration and the declarations of two other former Elexsys executives, all of whom said they believed that options would continue to vest while they were on severance pay.

Following a hearing, the trial court granted defendant's motion and gave the following reason: "[I]t is undisputed that defendants made no oral promises or representations to the plaintiff regarding his rights to exercise stock options following his termination. (Defendants' Undisputed Facts 37, 42, 43)." From the ensuing judgment, Barton appeals.

### STANDARD OF REVIEW

A "motion for summary judgment *shall* be granted if all the papers submitted show that there is no triable issue as to any *material* fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c), italics added.)

To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the "action has no merit or that there is no defense" thereto. (Code Civ. Proc., § 437c, subd. (a).) A defendant moving for summary judgment meets this burden by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (o)(2); *Addy* v. *Bliss & Glennon* (1996) 44 Cal.App.4th 205, 213-214 [51 Cal.Rptr.2d 642].) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of *material* fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (o)(2).) "Material" facts are those that relate to the issues in the case as framed by the pleadings. (*Juge* v. *County of Sacramento* (1993) 12 Cal.App.4th 59, 67 [15 Cal.Rptr.2d 598]; *People* v. *Hill* (1992) 3 Cal.App.4th 16, 29 [4 Cal.Rptr.2d 258].)

■ Since summary judgment involves pure matters of law, we review a summary judgment ruling de novo. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203]; *Parsons Manufacturing Corp.* v. *Superior Court* (1984) 156 Cal.App.3d 1151, 1156 [203 Cal.Rptr. 419].) If summary judgment was proper on

[2]Plaintiff subsequently dismissed the action with prejudice as to Mandaric.

grounds other than those articulated by the trial court, the appellate court must nevertheless affirm. (*Jackson* v. *Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1836 [20 Cal.Rptr.2d 913].)

DISCUSSION

### A. *The Written Stock Option Agreements Did Not Give Barton the Right to Exercise Vested and Nonvested Options 12 Months After His Termination*

 To the extent Barton's breach of contract claim is based on his written stock option agreements with Elexsys, it must fail. Those agreements, which Barton read and understood,[3] clearly set forth the terms under which his stock options terminated and ceased to vest. (See statement of facts, *ante*, pp. 1184-1185.) All three provided that the options would not continue to vest after termination.[4] They also provided that the options either ceased to be exercisable or had to be exercised within 30 days of termination. Under the terms of these written stock option contracts, Barton had no right to exercise his options a year after his employment was terminated. Accordingly, Elexsys cannot be liable for breach of contract based on these written agreements.

### B. *Barton's Severance Agreement Did Not Alter the Terms of His Stock Option Agreements*

In deposition, Barton testified that at the time he signed the three stock option agreements, he believed they constituted the only agreements between him and the company regarding his stock option grants. He further

---

[3]In deposition, Barton testified as follows regarding the terms of the October 9, 1992, agreement: "Q: What did you understand [the termination of employment provisions] to mean? [¶] A: That if an employment was terminated at any time for any reason other than by reason of death and disability during the option term, I understood it to mean exactly what was written. [¶] Q: You understood that any options that had not yet vested would not vest after your termination? [¶] A: Correct. [¶] Q: And you understood that with regard to exercising the options which had vested, that you would have a period of 30 days from the termination; is that correct? [¶] A: Correct."

He testified as follows regarding the September 9, 1993, agreement: "Q: What did you understand [the termination of employment provisions] to mean? [¶] A: If [I] ceased to be an employee, the options shall terminate. [¶] Q: So it's not going to continue to vest after the termination? [¶] A: Correct. [¶] Q: So you wouldn't be able to exercise it after the termination? . . . [¶] A: Yes."

As to the November 11, 1993, agreement, Barton explained his understanding as follows: "Q: [D]id you understand at the time you received [the agreement] and signed it, that if you were terminated at any time for any reason other than death or disability, that your vesting would cease? [¶] A: Yes. [¶] Q: And you understood you would have 30 days from the date of your termination in which to exercise the shares; correct? [¶] A: Correct."

[4]40,000 of the 55,000 shares that Barton attempted to purchase on September 28, 1995, had not vested as of his termination date.

testified that he did not believe his December 1993 severance agreement changed the terms of his stock option agreements: "Q: At the time you signed this letter on December 28, 1993, there was no change in your understanding regarding what would happen to your options in the event you were terminated; correct? . . . [¶] A: Up until this point, it was clear what would happen to the options. [¶] Q: And that's based upon the [stock option] agreements; correct? [¶] A: Correct."

Barton's severance agreement, which is quoted on pages 1185 to 1186 of this opinion, did not anywhere discuss "stock," "stock options," "vesting," or "exercise" of stock options. The focus of the agreement was instead on "payments" of "salary" should Barton's employment be terminated: "In the event your employment is terminated without cause by the Company, you will receive monthly payments equal to your monthly salary at the time of termination for twelve (12) months or until earlier employment."

Barton has failed to show that the severance agreement, which never mentioned stock options, was intended by the parties to alter the terms of the written stock option agreements. Accordingly, his breach of contract claim cannot be based on the written terms of the severance agreement.

C. *Barton Did Not Raise a Triable Issue of Fact in His Deposition That the Terms of the Written Stock Option Agreements or the Written Severance Agreement Were Orally Modified to Allow for the Vesting and Exercise of Stock Options 12 Months After Termination*

In deposition, Barton testified that his understanding of his written stock option agreements was changed as a result of conversations he had with Jonas and Mandaric.

The Jonas conversation took place shortly before Barton signed his December 1993 severance agreement. Jonas explained that Elexsys was concerned about how it could retain its key executives in light of the company's financial difficulties. Barton described the conversation as follows: "Q: Generally, what was discussed? [¶] A: Discussion was the genesis around changing to an Executive Salary Continuance Plan. [¶] Q: What do you mean by that? [¶] A: That there were discussions relative to the condition of the company, the state of the company, and what would—how you go about keeping employees, key executives, secure in the company. [¶] Q: What did you say to Mr. Jonas in that regard? [¶] A: I don't remember specifically. [¶] Q: What did Mr. Jonas say to you? [¶] A: That they had to be taken care of in general terms so that they wouldn't think they were at risk. . . . [¶] Q: Did you discuss at all stock options during that conversation? [¶] A: We

never got specific about stock options. [¶] Q: Did you ever discuss any changes in the stock option plan or stock option agreements for employees? [¶] A: No. . . . [¶] Q: Now, you said you formed a certain belief based upon that conversation. Did you express that belief to Mr. Jonas? [¶] A: No."

Here, the *only* representation Jonas made was "in general terms" that the key executives "had to be taken care of." Barton did not ask Jonas what he meant by the phrase "taken care of," and he did not express his own subjective interpretation of these words (that key executives' stock options would continue to vest and be exercisable throughout the period of salary protection).

Jonas's promise to "take[] care of" Elexsys's key executives is too vague and uncertain to support a claim that the parties' written stock option agreements had been modified thereby. (See e.g., *Rochlis* v. *Walt Disney Co.* (1993) 19 Cal.App.4th 201, 213-214 [23 Cal.Rptr.2d 793] [alleged promise to pay "appropriate" salary increases too vague and indefinite to be enforceable].) Furthermore, Barton's unexpressed subjective interpretation of Jonas's words, without more, cannot modify the parties' written agreements. (*Vaillette* v. *Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 686, 690 [22 Cal.Rptr.2d 807] ["Ordinarily, the words of the document are to be given their plain meaning and understood in their common sense; the parties' expressed objective intent, not their unexpressed subjective intent, governs. . . . [¶] . . . [¶] . . . The true, subjective, but unexpressed intent of a party is immaterial and irrelevant."].)

Barton does not rely on any other conversation with Jonas. In fact, he testified that after signing his severance agreement, he did not have any further discussion with Jonas regarding the terms of his severance package. This single discussion with Jonas is insufficient to raise a triable issue as to whether his written stock option agreements were orally modified.

Barton also contends that his written stock option agreements were modified as a result of a conversation he had with Mandaric. Barton described this conversation as follows: "Q: Do you remember any of those topics in the general conversation? [¶] [T]here was one other major one inasmuch as [Mandaric] made a statement—made reference to the stock that I had. I don't remember the exact words, but the words went something like 'You have nothing to worry about, you have 100,000 shares of stock,' or some number like that. [¶] Q: Anything else that he said to you regarding your stock or stock options? [¶] A: He may have, but that was the important part of the conversation that I remember. [¶] Q: But you don't recall any other— anything else he said in that conversation about the stock? [¶] A: No, and I

believe that number—I believe that was an accurate number that he said, but it may have had [a] plus or minus. . . . [¶] Q. Okay. What did you understand Mr. Mandaric to mean when he made that statement to you? [¶] A: [T]hat the stock would be vesting. . . . [¶] Q. Did you share [your] understanding with Mr. Mandaric in that conversation? [¶] A: No."

Barton reads Mandaric's comment as a binding, enforceable promise that Barton's shares would continue to vest while he was on salary protection and that he could, during the same period, exercise his stock options. We do not read Mandaric's comment in the same manner. Mandaric's observation that Barton had 100,000 shares of stock was not accompanied by any discussion of vesting or exercise of stock options. Rather, the comment appears to be a simple misconception on Mandaric's part as to how many shares of stock Barton held.

On September 30, 1994, the date Barton's employment was terminated, he had only 15,000 shares that he could purchase pursuant to the various stock option agreements. Almost a year later, when Barton attempted to exercise his stock options on September 28, 1995, he enclosed a check to purchase 55,000 shares of stock, not the 100,000 shares to which Mandaric had alluded. Had Barton's stock options continued to vest for the entire one-year period, fifty-five thousand was the maximum number of shares he could have purchased under the stock option agreements. Hence, Mandaric was incorrect under any scenario (i.e., if the stock options ceased vesting or if they continued to vest) when he opined that Barton had 100,000 shares of Elexsys stock.

To the extent that Mandaric's statement can be construed as a promise, it, like Jonas's statement, is simply too vague and uncertain to constitute an enforceable contract. (*Rochlis* v. *Walt Disney Co.*, *supra*, 19 Cal.App.4th at pp. 213-214.) Mandaric's comment is insufficient to raise a triable issue of fact as to whether the written stock option agreements were orally modified.

D. *Barton Did Not Raise a Triable Issue of Fact in the Evidence He Submitted (His Own Declaration and the Declarations of Two Other Elexsys Executives) in Opposition to Elexsys's Motion for Summary Judgment*

In Barton's declaration submitted in opposition to defendant's motion for summary judgment, he described his conversations with Jonas and Mandaric in slightly different terms from those he used in his deposition. ■ To the extent these descriptions directly contradict his discovery responses, they must be disregarded. (See, e.g., *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22 [112 Cal.Rptr. 786, 520 P.2d 10]; *Visueta* v.

*General Motors Corp.* (1991) 234 Cal.App.3d 1609, 1613 [286 Cal.Rptr. 402] ["Admissions or concessions made during the course of discovery govern and control over contrary declarations lodged at a hearing on a motion for summary judgment."].)

As to the Jonas conversation, Barton declared: "Mr. Jonas told me that the purpose of the 'Executive Salary Continuance Plan' was to motivate key executives to stay with the company during the difficult financial period. *I do not remember Mr. Jonas'[s] exact words to me*, but, as I testified in my deposition, the output of Mr. Jonas'[s] representations to me was that the Executive Salary Continuance Plan covered all elements of compensation *as if I was still employed with the company*. It is true that I do not specifically remember Mr. Jonas specifically referencing stock options (or any other specific element of compensation). However, I understood that Mr. Jonas was representing to me that all elements of compensation would be provided under the Executive Salary Continuance Plan—including stock options."

This declaration does not create a triable issue of fact. Barton acknowledges that Jonas did not specifically reference stock options. Nevertheless, Barton subjectively concluded from this conversation that his stock options would continue to vest and be exercisable after his termination. Barton's belief, without more, cannot create a binding agreement, especially one that contradicts the terms of various written agreements. (*Vaillette* v. *Fireman's Fund Ins. Co.*, *supra*, 18 Cal.App.4th at p. 686.) It is undisputed that Barton did not share his belief with any managing agent of Elexsys.

As to the Mandaric conversation, Barton declares: "After I was informed that my employment would be terminated, Milan Mandaric specifically informed me that stock options would be covered under the plan. Again, I do not remember Mr. Mandaric's exact words, but I do remember his specifically referencing stock options." This statement directly contradicts Barton's deposition testimony,[5] and consequently must be disregarded. (*D'Amico* v. *Board of Medical Examiners*, *supra*, 11 Cal.3d at pp. 21-22; *Visueta* v. *General Motors Corp.*, *supra*, 234 Cal.App.3d at p. 1613.)

Barton also claims in his declaration that "[t]he Severance Agreement was not intended to set forth all of the benefits covered under the Executive Salary Continuance Plan. Indeed the Severance Agreement fails to reference all of the elements of compensation covered under the Executive Salary

---

[5]In deposition, as noted above, Barton stated that Mandaric told him he had 100,000 shares of stock. When asked if Mandaric said anything else "to you regarding your stock or stock options," Barton responded, "He may have, but that was the important part of the conversation that I remember." Then he was specifically asked, "But you don't recall any other— anything else he said in that conversation about the stock?" Barton answered, "No . . . ."

Continuance Plan. The elements of my compensation at Elexsys included an automobile allowance, gas card, mobile telephone service, stock options, monthly salary, and health benefits. . . . Elexsys provided me with all of the elements of my compensation under the Executive Salary Continuance Plan except stock options."

However, the fact that Barton was paid certain payroll benefits in addition to his base salary during his severance period has nothing to do with whether the parties intended to change the explicit terms of Barton's written stock option agreements. Those agreements, as noted, provided that stock options would cease to vest after termination, and would not, under any circumstance, be exercisable more than 30 days after termination. In his deposition, Barton acknowledged that his stock options were governed by the express terms of his stock option agreements and that the severance agreement did not change his understanding of the stock option agreements. If the severance agreement, which was fully integrated ("This agreement replaces and supersedes any prior executive salary continuance or severance arrangement"), was intended to modify the terms of Barton's existing stock option agreements, it had to do so in writing ("Exceptions to the above require the written approval of the President/C.E.O.").

Nor has Barton proffered evidence that the continuation of other employment-related benefits (such as health insurance, cellular phone, and company car) directly contradicted a written agreement that governed the company's obligations to him vis-à-vis those benefits. The fact that Barton continued to receive other employment benefits is, therefore, irrelevant.

Finally, Barton submitted the declarations of two other terminated Elexsys executives[6] who each declared that they thought stock options would continue to vest and be exercisable during the salary continuation period. These declarations are irrelevant because it is undisputed that separate and distinct severance packages were designed for each individual executive. Elexsys objected to the admission of these declarations, and the trial court, in finding that there was no triable issue of material fact in the action, specifically declared that it was "excluding all inadmissible or incompetent evidence."

---

[6]Charles Bonasera, like Barton, is suing Elexsys for breach of contract for not allowing him to exercise stock options following his termination. Frank Hale's stock option agreements were modified in writing by the company to allow him to exercise his stock options approximately six weeks after termination. The written amendment to Hale's stock option agreements, dated April 19, 1995, states in pertinent part: "Options to purchase 61,200 shares of the Company's Common Stock were exercisable on March 17, 1995, the date on which you ceased to be an employee of the Company. [¶] Notwithstanding the terms of the Agreements, which provide that your Options ceased to be exercisable immediately upon the termination of your employment with the Company, this letter serves to confirm that your Options, to the extent exercisable on March 17, 1995, may be exercised by you in accordance with the terms of the Agreements on or before April 28, 1995."

### E. *The Trial Court's Order Granting Summary Judgment Is Sufficient*

Barton also contends the grant of summary judgment should be reversed because the trial court's order did not comply with Code of Civil Procedure section 437c, subdivision (g). That section provides, in pertinent part: "Upon the grant of a motion for summary judgment, on the ground that there is no triable issue of material fact, the court shall, by written or oral order, specify the reasons for its determination. The order shall specifically refer to the evidence proffered in support of, and if applicable in opposition to, the motion which indicates that no triable issue exists. The court shall also state its reasons for any other determination. The court shall record its determination by court reporter or written order." As we shall explain, we conclude that the trial court complied with this requirement.

Here, the trial court did "specify the reasons for its determination." (Code Civ. Proc., § 437c, subd. (g).) At the hearing on the motion, the trial court announced its tentative ruling to grant Elexsys's motion. It then stated, "Let me give you the basis of the tentative ruling, see if that answers your question. [¶] First of all, I'm going to decline to render formal rulings on the evidentiary objections. I have disregarded all inadmissible, incompetent evidence in making my ruling. That's the Biljac Associates case: Biljac Associates versus First Interstate Bank of Oregon, 1990 case at 218 Cal.App.3d 1410, 1419, 1420 [267 Cal.Rptr. 819]. [¶] The basis for the Court granting summary judgment is undisputed that defendants made no oral promises or representations to the plaintiff regarding his rights to exercise the stock options following his termination. [¶] And I'm referring to Defendants' Settled Statement of Facts; that would be numbers 37, 42, and 43.'"[7]

The court's written order is equally clear. As to the first, second, and third causes of action, the court wrote: "Defendants' motion is GRANTED as against plaintiff James Barton because it is undisputed that defendants made no oral promises or representations to the plaintiff regarding the rights to exercise stock options following his termination. (Defendants' Undisputed Facts 37, 42, 43.)"

---

[7]Undisputed fact 37, and the evidence supporting it, are as follows: "At the time of his termination from Elexsys, neither Jonas nor Mandaric informed Barton that his stock options would continue to vest or that he would be able to exercise them after his termination."

Undisputed fact 42, and the evidence supporting it, are as follows: "The only statement which Barton testified in deposition that Peter Jonas made to him regarding stock options or severance benefits for company employees was 'That they had to be taken care of in general terms so that they wouldn't think they were at risk.' "

Undisputed fact 43, and the evidence supporting it, are as follows: "The only statement which Barton testified in deposition that Milan Mandaric made to him regarding stock options, severance agreements or severance benefits was 'You have nothing to worry about, you have 100,000 shares of stock; or some number like that.' "

In his separate statement of undisputed facts submitted in opposition to Elexsys's motion, Barton did not address defendants' undisputed facts Nos. 42 and 43, thereby leaving them undisputed. He did dispute defendants' undisputed fact No. 37 ("At the time of his termination from Elexsys, neither Jonas nor Mandaric informed Barton that his stock options would continue to vest or that he would be able to exercise them after his termination"), based on his deposition testimony, his declaration in opposition to the summary judgment motion, and the declaration of Charles Bonasera, who claimed that he was told that stock options would continue to vest during the salary protection period.[8] As noted above in parts C and D of this opinion, however, none of this evidence is sufficient to create a triable issue of material fact.

Under these circumstances, we conclude that the trial court correctly granted summary judgment in favor of Elexsys.

### DISPOSITION

The judgment is affirmed. Costs on appeal to defendants.

Bamattre-Manoukian, J., and Mihara, J., concurred.

---

[8]Barton offered no evidence that Bonasera told him about Bonasera's alleged conversations with Jonas or Mandaric.