[No. B190831. Second Dist., Div. Two. Sept. 11, 2007.]

VERNON VAN et al, Plaintiffs and Appellants, v.
TARGET CORPORATION, Defendant and Respondent.

VERNON VAN et al., Plaintiffs and Appellants, v.
WAL-MART STORES, INC., Defendant and Respondent.

VERNON VAN et al., Plaintiffs and Appellants, v.
HOME DEPOT U.S.A., INC., Defendant and Respondent.

**COUNSEL**

Arias, Ozzello & Gignac, H. Scott Leviant, Mike Arias, Mark A. Ozzello and Arnold C. Wang for Plaintiffs and Appellants.

Morrison & Foerster, David F. McDowell and Nancy R. Thomas for Defendant and Respondent Target Corporation.

Manatt, Phelps & Phillips, Matthew P. Kanny, Diana N. Iketani and Joelle A. Gryczman for Defendant and Respondent Wal-Mart Stores, Inc.

Katten Muchin Rosenman, Thomas J. Leanse and Stacey McKee Knight for Defendant and Respondent Home Depot U.S.A., Inc.

---

**OPINION**

**DOI TODD, J.**—Appellants Vernon Van and Mary Rose Barry brought separate actions against Target Corporation, Wal-Mart Stores, Inc., and Home Depot U.S.A., Inc. (sometimes collectively respondents), alleging that respondents unlawfully prevented them from gathering signatures in front of respondents' stores that are located in commercial retail complexes. The trial court granted summary judgment in favor of respondents, ruling that individual stores did not possess the attributes of a public forum.

We affirm. *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341] (*Pruneyard*), affd. *sub nom. Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035] held that the California Constitution protects expressive activity in the common areas of a large, privately owned shopping center. The *Pruneyard* holding does not apply to the area immediately surrounding the entrance of an individual retail store that does not itself possess the characteristics of a public forum, even when that store is part of a larger shopping center.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Parties*

Target Corporation (Target) operates hundreds of retail stores in California, many of which are located in large shopping centers. Though the nature of the property and other establishments surrounding each store may vary, the Target stores themselves are quite uniform. Many Target stores contain Food Avenue restaurants. Target stores typically have only one or two doorways through which all customers must necessarily pass. In 2002, company policy provided that "Target does not prohibit individuals or groups from engaging in constitutionally protected speech in front of its California stores," but that it may reasonably regulate the time, place and manner of such expression. As of 2005, Target's policy was to prohibit solicitors from any organization from being on store property. Solicitors would be given a copy of Target's solicitation policy, told they were trespassing and asked to leave.

Wal-Mart Stores, Inc. (Wal-Mart), operates 152 Wal-Mart stores (149 discount stores and three supercenters) and 33 Sam's Club stores in California. Though the location of the Wal-Mart stores varies from freestanding to part of large shopping centers, the stores themselves—like Target—are quite uniform. Typically, Wal-Mart stores contain only one or two main doorways, with additional doorways at the garden department and/or the automotive department. Many Wal-Mart stores contain restaurants or cafeterias, and some stores feature bulletin boards with photographs of missing children. Four Wal-Mart stores in California are located in enclosed shopping malls which Wal-Mart neither owns nor operates. There is a separate mall entrance to Wal-Mart at those four locations, though 80 to 90 percent of the customers use the stores' main entrance. Some of the shopping centers where Wal-Mart stores are located host community events and contain facilities that invite the public to congregate and linger.

According to Wal-Mart's rules and regulations for petitioning and soliciting from Wal-Mart California property, "petitioning and soliciting shall only take place in the designated areas specified by Wal-Mart." Signs developed in 1996 and posted in several Wal-Mart stores stated: "Wal-Mart apologizes for any inconvenience caused by solicitors outside our store. We do not advocate their methods of expressions. Their presence is currently permitted by California court decision. If you object to the presence of these solicitors, contact your state assembly person."

Home Depot U.S.A., Inc. (Home Depot), operates 187 stores in California which primarily sell home, garden, construction and home improvement items. Approximately 70 percent of Home Depot stores are stand-alone stores, while the remaining stores are in a variety of locations, including strip retail developments and shopping centers. Home Depot is a tenant at all of its California locations. Though the square footage of the stores varies, the stores are generally uniform in design and layout. They typically have one or two doorways at the main entrance through which all customers must pass and one additional doorway at the garden department. Unless restricted by city ordinance, Home Depot uses the area immediately in front of the store—the "apron"—as an extension of the store's sales operations. Some Home Depot stores contain restaurants. Some of the shopping centers where Home Depot stores are located feature plazas, common walkways and/or central courtyards with sitting areas.

Appellants represent a class of individuals who gather voter signatures for initiatives, referenda and recalls and register voters for upcoming elections. On multiple occasions, after appellants had set up a table off to the side of the entrance to either Target, Wal-Mart or Home Depot for the purpose of collecting signatures, individuals identifying themselves as management employees would demand that appellants leave.

### The Complaints and Summary Judgment Motion

Appellants filed three identical complaints in August 2004 against Target, Wal-Mart and Home Depot. Each complaint alleged causes of action for the violation of right to free speech, violation of Civil Code sections 51 and 52, violation of Business and Professions Code section 17200 and declaratory relief, and sought damages and equitable and injunctive relief. The cases were deemed both related and complex pursuant to California Rules of Court, rules 3.300 and 3.400, respectively, and assigned to one judge.

On April 29, 2005, respondents filed a joint motion for summary judgment. They asserted that appellants had no constitutional right to enter respondents' property, as the stores were not public fora within the meaning of *Pruneyard*. In support of their motion, they submitted declarations from store management employees who described the purpose and layout of the stores, emphasizing that the stores are designed to encourage shopping as opposed to congregating and lingering and for that reason do not contain amenities such as gathering areas or entertainment. They also sought judicial notice of injunctive orders and judgments in other California cases prohibiting the direct or indirect use of store property for any expressive activity, including the collection of signatures.

Nine months later, on January 27, 2006, appellants filed their opposition to the motion. Conceding that their action was directed only at Target, Wal-Mart and Home Depot stores located in larger retail developments—as opposed to stand-alone stores—they asserted that such developments were public fora where appellants had the right to exercise free speech by gathering signatures.

In support of their opposition, appellants submitted their own declarations describing their experience of being asked to leave various store locations by individuals who identified themselves as employees of either Target, Wal-Mart or Home Depot.

They also offered the declaration of Professor Anastasia Loukaitou-Sideris, chair of the University of California, Los Angeles's Department of Urban Planning; she provided general information about the role of shopping centers in contemporary times. She declared that "[t]he economic lifeblood once found downtown has moved to the suburban shopping centers, which have substantially displaced the downtown business districts as the centers of both commercial and social activity." As a result of her surveying 39 California shopping centers, she concluded that a significant percentage of Target, Wal-Mart and Home Depot stores were part of shopping centers that had "a unified architectural theme and common court yards, walkways, and parking facilities." She found that those shopping centers exhibited several common characteristics, including that they "(1) feature common areas, courtyards or plazas, inviting people to gather or socialize; (2) have multiple uses, which in addition to shopping may include entertainment, and services; (3) are open and freely accessible to the public."

She further noted that many of the shopping centers surveyed included restaurants and theaters and hosted community events, and that many Target and Wal-Mart stores contained restaurants and video arcades on the premises. She opined that "areas of the shopping centers outside the stores are functionally equivalent to the town's public sidewalks" because the centers are surrounded by residential blocks lacking public spaces and those areas often provide one gathering signatures the only means of accessing the public. She concluded that respondents "operate stores in shopping centers and malls which have replaced the traditional public forums and effectively act as community centers and nodal points for their surrounding communities."

Appellants also submitted numerous photographs of Target, Wal-Mart and Home Depot stores in shopping center settings, as well as information about the configuration of and amenities provided by those centers, including their restaurants, theaters, and community events.

Respondents replied on February 10, 2006. They emphasized that appellants' evidence focused on the public nature of shopping centers as a whole as opposed to the particular Target, Wal-Mart and Home Depot stores located at those shopping centers. They also submitted evidentiary objections to Professor Loukaitou-Sideris's declaration and each of appellants' declarations.

*The Trial Court's Ruling*

The trial court heard the motion on February 14, 2006. On March 6, 2006, it filed an order granting summary judgment. The trial court framed the dispositive issue as whether First Amendment protection should be accorded to expressive activity that does not occur in common areas, but rather, takes place on property controlled by specific retailers. Answering that question in the negative, the trial court ruled: "Although plaintiffs have presented evidence that the SHOPPING CENTERS themselves may contain plazas, courtyards and common areas there is no admissible evidence presented that these moving defendants' store entrances, aprons and perimeters thereto consist of plazas, courtyards, walkways and entertainment or dining venues. In fact, the opposite is true in the sense that the aprons and perimeters of these establishments have become, in many instances, an extension of the store itself." On the basis of this evidence, the court concluded "that the societal interest in using defendants' stores as forums for exercising free speech and petitioning activities does not outweigh the defendants' interests in exercising exclusive control over the use of their private property." To the extent that respondents' stores were located in larger complexes containing common areas, the trial court noted that appellants "need to look to mall owners for the right to conduct expressive activity and not to these specific retail establishments."

Accordingly, the trial court granted summary judgment and thereafter entered three separate judgments in favor of respondents. Appellants appealed each of the judgments and the three matters have been consolidated for appeal.

**DISCUSSION**

I. *Standard of Review.*

Appellants contend that the trial court erred in granting summary judgment for two reasons. First, they assert that triable issues of fact existed as to whether they were gathering signatures on respondents'—as opposed to a

particular shopping center's—private property. Second, they contend the trial court erroneously concluded that the area in front of respondents' stores was not a public forum.

Summary judgment is warranted when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) Defendants moving for summary judgment meet this burden by showing that one or more elements of a cause of action cannot be established or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (p)(2).) Once a defendant makes this showing, the burden shifts to the plaintiff to set forth specific facts showing that a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Barton v. Elexsys Internat., Inc.* (1998) 62 Cal.App.4th 1182, 1187 [73 Cal.Rptr.2d 212].)

We review a trial court's grant of summary judgment de novo, "considering 'all of the evidence set forth in the [supporting and opposition] papers, except that to which objections have been made and sustained by the court, and all [uncontradicted] inferences reasonably deducible from the evidence.'" (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313]; see also *Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 148 [124 Cal.Rptr.2d 1].) "In independently reviewing a motion for summary judgment, we apply the same three-step analysis used by the superior court. We identify the issues framed by the pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue." (*Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 261 [76 Cal.Rptr.2d 382].)

■ On the basis of our review, we conclude that the trial court correctly granted summary judgment. The undisputed evidence demonstrated the private nature of the property on which appellants sought to gather signatures. It further showed that the entrance area of respondents' stores did not function as a public forum where appellants would be entitled to engage in expressive activities.

II. *The California Constitution Protects Expressive Activity Conducted in a Public Forum, Which Includes a Privately Owned Shopping Center.*

■ The First Amendment to the United States Constitution does not encompass the right to engage in expressive activity at a privately owned shopping center. (*Hudgens v. NLRB* (1976) 424 U.S. 507, 519–520 [47 L.Ed.2d 196, 96 S.Ct. 1029].) But in *Pruneyard*, our state Supreme Court

held that "sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned."[1] (*Pruneyard, supra,* 23 Cal.3d at p. 910.)

*Pruneyard* involved the privately owned, 21-acre Pruneyard Shopping Center, which contained walkways, plazas and buildings that housed 65 shops, 10 restaurants, and a movie theater. (*Pruneyard, supra,* 23 Cal.3d at p. 902.) Approximately 25,000 persons visited daily to take advantage of the shopping center's numerous amenities. (*Id.* at pp. 902, 910.) During a weekend, high school students set up a card table in the shopping center's central courtyard to discuss their concerns and gather signatures for a petition in support of their opposition to a United Nations resolution against Zionism. (*Ibid.*) A shopping center security guard instructed them to leave. (*Ibid.*)

The *Pruneyard* court examined the growing prevalence and importance of the suburban shopping center, noting that "central business districts apparently have continued to yield their functions more and more to suburban centers." (*Pruneyard, supra,* 23 Cal.3d at p. 907.) Given the essentially public character of privately owned shopping centers, the court concluded that "[s]hopping centers to which the public is invited can provide an essential and invaluable forum for exercising" the rights of free speech and petition provided by the California Constitution. (*Id.* at p. 910.) It reached this conclusion by balancing the competing interests of a private property owner with society's interest in using the private property as a forum for the expressive activity, reasoning that a handful of orderly students gathering signatures would not interfere with the normal business operations of a large shopping center. (*Id.* at pp. 910–911.) The court emphasized that it was not balancing " 'the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment.' " (*Id.* at p. 910.)

Subsequent decisions applying the *Pruneyard* balancing test focus on whether private property serves as the functional equivalent of a public forum. (*Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th 106, 118 [131 Cal.Rptr.2d 721] (*Albertson's*); *Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1660 [39 Cal.Rptr.2d 189].) Courts consider

---

[1] Article I, section 2, subdivision (a), of the California Constitution states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Article I, section 3 states: "The people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good."

several factors in making that determination: "Whether private property is to be considered quasi-public property subject to the exercise of constitutional rights of free speech and assembly depends in part on the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants." (*Albertson's, supra,* at p. 119.)

Applying these factors, courts have consistently concluded that modest and individual commercial and retail establishments lack the characteristics of a public forum. Addressing a commercial establishment, the court in *Allred v. Harris* (1993) 14 Cal.App.4th 1386, 1388, 1392 [18 Cal.Rptr.2d 530], held that a 19-tenant medical center with an adjacent parking lot containing over 250 parking spaces lacked the attributes of a public forum because it did not provide a place for the general public to congregate, but rather, provided services to a specific clientele. (Accord, *Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662, 1671–1672 [286 Cal.Rptr. 427] [multistory medical plaza with parking lot lacked attributes of a public forum]; *Allred v. Shawley* (1991) 232 Cal.App.3d 1489, 1501–1502 [284 Cal.Rptr. 140] [same].)

*Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425 [86 Cal.Rptr.2d 442] involved a retail establishment. There, individuals sought to gather signatures at the entrance to an 11,000-square-foot, stand-alone specialty retail store. The appellate court affirmed the issuance of an injunction against such activity, finding that Trader Joe's interest in exercising exclusive control over its private property outweighed any societal interest in using Trader Joe's as a forum for free speech. (*Id.* at p. 434.) Examining Trader Joe's interests, the court stated: "Trader Joe's invitation to the public to visit its Santa Rosa store is more limited than the invitation made by a shopping center like Pruneyard. Trader Joe's invites people to come and shop for food and food-related items. It does not invite them to meet friends, to eat, to rest or to be entertained. Indeed, citizens are not invited to 'congregate' at the Santa Rosa Trader Joe's. Thus, in our view, Trader Joe's interest in maintaining exclusive control over its private property is stronger than the interest of a shopping mall owner." (*Id.* at p. 433.) Correspondingly, the court found that the public's interest in using Trader Joe's as a forum for free speech was not as strong as its interest in using a large shopping center, as Trader Joe's was a single structure and single-use store; contained no plazas, walkways or a central courtyard for customers to congregate; lacked a restaurant or any place for patrons to sit and eat; and lacked a movie theater or any other form of entertainment. (*Ibid.*) The court concluded: "Trader

Joe's opens its property to the public so the public can buy goods. It does not offer its property for any other use. Thus, in contrast to Pruneyard and other multipurpose shopping centers, the Santa Rosa Trader Joe's does not have a 'public character.' [Citation.]" (*Id.* at p. 434.)

In *Costco Companies v. Gallant* (2002) 96 Cal.App.4th 740, 755 [117 Cal.Rptr.2d 344] (*Costco Companies*), the court similarly found that Costco's interest in controlling its property outweighed the public's interest in using a Costco store as a public forum. It distinguished a stand-alone Costco store from a large shopping center: "Unlike the patrons of a large regional shopping center, Costco customers do not come to its stores with the expectation they will meet friends, be entertained, dine or congregate. While outlets such as Costco are popular, because of the narrow activity they offer—the purchase of goods and services offered by Costco—they are in no sense ' "miniature downtowns." ' [Citation.]" (*Ibid.*)

Courts have reached the same balance when considering the interests of individual retailers within larger shopping centers. In *Albertson's, supra*, 107 Cal.App.4th at page 122, the court held that the walkway at the entrance to an Albertson's grocery store was not a public forum. The Albertson's store was located in the 14-acre Fowler Center, which contained other retailers, restaurants, service providers and ample parking, but did not contain any courtyards or plazas. (*Id.* at pp. 110–111.) The front of the Albertson's store contained water and soda dispenser machines and some courtesy benches; occasionally Albertson's would offer items for sale in front of the store. The Albertson's store did not have its own restaurant or any other type of meeting space. (*Id.* at pp. 111–112.)

In determining whether the Albertson's store was the functional equivalent of a traditional public forum, the court first considered the nature of the store itself. It noted that the store contained no plazas, walkways or courtyards for patrons to congregate; had no place for patrons to sit and eat except a courtesy bench; and provided no form of entertainment. (*Albertson's, supra*, 107 Cal.App.4th at p. 120.) In sum, "[t]he store did not invite the public to meet friends, to eat, to rest, to congregate, or to be entertained at its premises." (*Ibid.*) Similarly, the court found that the Albertson's store's presence in the Fowler Center did not impress the store's walkways with the character of a traditional public forum. (*Id.* at p. 122.) The center was comprised of seven different buildings that housed a variety of retailers, restaurants and services, but did not contain any common area that would

invite the public to meet or congregate. (*Id.* at pp. 121–122.) Under these circumstances, the court found the Albertson's store in the Fowler Center akin to a stand-alone store and ruled that it lacked the characteristics of a traditional public forum. (*Id.* at p. 127.)

Similarly, the district court in *Slevin v. Home Depot* (N.D.Cal. 2000) 120 F.Supp.2d 822 determined that the area in front of a Home Depot store's main exit was not a public forum. The area at issue contained a hot dog stand with seating for up to 12 persons, and a "Public Forum Area" sign was posted outside immediately adjacent to the store. (*Id.* at p. 834, capitalization omitted.) The store was situated in a larger shopping center, but not one that contained common plazas or courtyards or entertainment areas. (*Ibid.*) Under these circumstances, the court concluded that the presence of an eating area in front of the store did not "transform the Home Depot into the hub of activity envisioned in *Pruneyard*, which involved a 21 acres shopping center housing some 65 shops, 10 restaurants, and a cinema." (*Slevin v. Home Depot, supra*, at p. 834.)

■ Synthesizing the principles to be gleaned from this authority, the *Albertson's* court summarized: "To establish a right to solicit signatures at the entrance to a specific store, it must be shown that the particular location is impressed with the character of a traditional public forum for purposes of free speech." (*Albertson's, supra*, 107 Cal.App.4th at p. 122.) More specifically, "[a] location will be considered a quasi-public forum only when it is the functional equivalent of a traditional public forum as a place where people choose to come and meet and talk and spend time." (*Id.* at p. 121.)

## III. *The Trial Court Properly Granted Summary Judgment.*

### A. *There Was No Triable Issue of Material Fact Concerning the Private Ownership of the Property at Issue.*

In their complaints, appellants alleged that they were "uniformly, and consistently evicted from premises owned and operated by [respondents]." At the hearing on the summary judgment motion, appellants argued for the first time that summary judgment should be denied because a triable issue of fact existed concerning the ownership of the apron area in front of each store. They read excerpts of certain leases into the record, which showed that the property at issue was owned by the shopping centers and not included in at least some of the stores' leases. Because the apron areas were shopping center property, appellants contended that those areas should be considered public fora, similar to other common areas of large shopping centers.

In its ruling, the trial court did not consider the question of ownership, but rather, evaluated the character of the property immediately in front of the stores to determine whether "the holding in *Pruneyard* appl[ies] to the entrances, aprons and side entrance perimeters of retail establishments that may be part of larger shopping centers." On the basis of undisputed evidence that the apron areas did not contain common areas such as plazas or courtyards, coupled with evidence that many stores used that area to display items for sale, the trial court concluded "that the aprons and perimeters of these establishments have become, in many instances, an extension of the store itself. All sorts of seasonal merchandise are placed on the sides of the entrances for further retailing."

We reject appellants' argument that summary judgment was improperly granted because respondents did not meet their burden to show that they owned or leased the property immediately in front of their stores. "[A] summary judgment motion is directed to the issues framed by the pleadings. [Citations.] Those are the only issues a motion for summary judgment must address. [Citations.]" (*Hilton K. v. Greenbaum* (2006) 144 Cal.App.4th 1406, 1412 [51 Cal.Rptr.3d 295].) More precisely, because "a party cannot successfully resist summary judgment on a theory not pleaded [citations] . . . . [a] plaintiff cannot avoid summary judgment by asserting on appeal a theory inconsistent with her pleadings and the representations made in the trial court." (*Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1576 [2 Cal.Rptr.3d 883]; accord, *Vournas v. Fidelity Nat. Tit. Ins. Co.* (1999) 73 Cal.App.4th 668, 674, fn. 6 [86 Cal.Rptr.2d 490] [an "appellant may not defeat a summary judgment motion by producing evidence to support claims that are outside the issues framed by the pleadings"].) Appellants alleged that the areas in question were respondents' property. The issues framed by the pleadings, therefore, did not include the question of the property's ownership and there was no reason for respondents to address ownership in their motion.[2]

---

[2] In their reply brief, appellants contend they should not be bound by their complaints because they could have sought leave to amend to allege ownership differently. But they never requested leave to amend in the trial court, have not explained why such leave was not requested and have failed to cite any authority for the proposition that it could be requested at this late date. (See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 1139, p. 595 [once judgment is entered complaint can only be amended if judgment vacated by motion under Code Civ. Proc., § 473 or by motion for a new trial].) Moreover, amendments are usually allowed after summary judgments have been filed only to repair complaints that are legally insufficient—in other words, those that would be subject to a motion for judgment on the pleadings. (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719, fn. 5 [34 Cal.Rptr.2d 898, 882 P.2d 894]; *Hobson v. Raychem Corp.* (1999) 73 Cal.App.4th 614, 625 [86 Cal.Rptr.2d 497], disapproved on another ground in *Colmenares v. Braemar Country Club, Inc.* (2003) 29

Further, given the undisputed evidence concerning the character and use of the stores' apron and perimeter areas, we cannot conclude that any ambiguity as to the areas' actual ownership constituted a triable issue of material fact. The evidence was undisputed that the areas in question were private property. As the trial court recognized, the undisputed evidence further showed that respondents controlled the areas immediately outside their stores by using those areas to sell merchandise. Under these circumstances, the issue to be resolved by summary judgment was properly confined to the question of whether the areas at issue functioned as public fora so as to preclude respondents from interfering with appellants' signature gathering.

> B. *The Undisputed Evidence Established That the Area Immediately Surrounding Respondents' Stores Lacked the Characteristics of a Public Forum.*

The trial court ruled that any societal interest in using the apron and perimeter areas of respondents' stores as public fora for exercising free speech was outweighed by respondents' interest in maintaining exclusive control over those areas. Evaluating the relevant factors, the trial court found that while respondents had opened their property to the shopping public, appellants "offered no evidence that the [respondents'] stores themselves are inviting the public to congregate, meet friends or be entertained." It reasoned that the restaurants or video arcades contained in some stores did not imbue those stores with the attributes of a public forum. Finally, it noted that "since the [respondents'] stores usually only have one or two entrances there is a greater risk than in *Pruneyard* that defendants will be identified with [appellants'] message or that shoppers will be unable to avoid [appellants] when entering or exiting the stores."

On the basis of the undisputed evidence before the trial court, we conclude that the trial court properly balanced the interests of respondents and society to conclude that the apron and perimeter areas of respondents' stores do not act as the functional equivalent of a traditional public forum. Turning first to the nature, purpose and primary use of the property (see *Albertson's, supra,* 107 Cal.App.4th at p. 119), the evidence established that neither respondents' stores themselves nor the apron and perimeter areas of the stores were

---

Cal.4th 1019, 1031, fn. 6 [130 Cal.Rptr.2d 662, 63 P.3d 220].) Appellants' proposed amendment would not cure a legally insufficient complaint, but rather, would state a different theory of recovery. Such an amendment is impermissible. (*Hobson v. Raychem Corp., supra,* at p. 626.)

comprised of courtyards, plazas or other places designed to encourage patrons to spend time together or be entertained. The nature of the stores is akin to that described in *Albertson's*, where the store "contain[ed] no plazas, walkways, or courtyards for patrons to congregate and spend time together" and did "not invite the public to meet friends, to eat, to rest, to congregate, or to be entertained at its premises." (*Albertson's, supra*, at p. 120.)

With respect to the nature and extent of the public invitation to use the property, the evidence showed that the stores are uniformly designed to encourage shopping as opposed to meeting friends, congregating or lingering. As the trial court noted, respondents often used the apron and perimeter areas of the stores to display seasonal merchandise—a use consistent with the stores' invitation to the public to shop. Appellants point to evidence that many stores contain restaurants and that some contain video arcades or community bulletin boards as evidence of an invitation to the public to congregate. But there was no evidence that these store amenities are designed to encourage patrons to congregate or used by patrons as a gathering place. Instead, appellants' evidence indicated that the restaurants found within Target stores were intended to facilitate the ease of patrons' shopping experience. We agree with the characterization in *Slevin v. Home Depot, supra*, 120 F.Supp.2d at page 834, where the court described an interior restaurant or video game as merely a "sidelight" to the store's operation which does not "transform the Home Depot [and other respondents' stores] into the hub of activity envisioned in *Pruneyard*," involving a 21-acre shopping center with dozens of stores, 10 restaurants and a movie theater.

Finally, we see no relationship between the ideas sought to be presented and the purpose of the property's occupants.[3] (See *Albertson's, supra*, 107 Cal.App.4th at p. 119; *Allred v. Shawley, supra*, 232 Cal.App.3d at p. 1501.) Rather, as the trial court acknowledged, because respondents' stores generally have only one or two entrances and exits, appellants' positioning themselves immediately in front of the stores creates a significant risk that store patrons will associate the stores with appellants' message. Moreover, the stores' limited access means that patrons will be unable to avoid appellants when entering or exiting the stores. (See *Costco Companies, supra*, 96 Cal.App.4th at p. 755 [because Costco store had only one entrance and exit, customers "have no practical means of avoiding encounters with petition gatherers and other participants in expressive activities"].) The circumstances here are no

---

[3] That some Target stores imposed time, place and manner restrictions or that some Wal-Mart stores had posted signs indicating that soliciting and petitioning were permitted in designated areas did not create a triable issue of fact. (See *Slevin v. Home Depot, supra*, 120 F.Supp.2d at p. 835 [store's implementation of an application procedure for individuals desiring to engage in expressive activities did not raise a triable issue on summary judgment, as "[t]he mere fact that a store implements time, place, and manner regulations does not transform the area into a public forum"].)

different than those in *Albertson's*, where the court observed: "It is obvious that, by setting up at the entrances to the grocery store, defendants target Albertson's customers rather than the patrons of Fowler Center in general." (*Albertson's, supra*, at p. 122.) The inability of respondents' patrons to avoid appellants at store entrances and exits creates the risk of appellants' interfering with respondents' normal business operations. (See *Pruneyard, supra*, 23 Cal.3d at p. 911.)

Respondents' stores—including the store apron and perimeter areas—are not designed as public meeting spaces. The stores' invitation to the public is to purchase merchandise and no particular societal interest is promoted by using the stores for expressive activity. As such, respondents' interest in maintaining control over the area immediately in front of their stores outweighs society's interest in using those areas as public fora. We are not persuaded by appellants' central argument that the presence of respondents' stores in larger, *Pruneyard*-type shopping centers alters this balance. Appellants contend that a triable issue of material fact exists as to the public nature of the stores' apron and perimeter areas because their evidence demonstrated that many stores are physically attached to larger shopping centers which generally contain a uniform architectural theme, plazas and courtyards that encourage patrons to congregate, myriad restaurants and various forms of entertainment, including movie theaters and community events. They assert that evidence showing Target, Wal-Mart and Home Depot stores often serve as shopping center "anchors" highlights the indivisible nature of respondents' stores and the shopping centers themselves.

The trial court relied heavily on *Albertson's* in rejecting appellants' argument. In that case, the court "conclude[d] that Albertson's location in Fowler Center does not impress the walkways of Albertson's store with the character of a traditional public forum." (*Albertson's, supra*, 107 Cal.App.4th at p. 122.) We acknowledge that—unlike the shopping centers in which many of respondents' stores are located—the shopping center in *Albertson's* lacked any public forum attributes, including gathering places or entertainment. (*Ibid.*) Nonetheless, we are guided by the more general test set forth in that case, providing that "[t]o establish a right to solicit signatures *at the entrance to a specific store*, it must be shown that the *particular location* is impressed with the character of a traditional public forum for purposes of free speech." (*Ibid.*, italics added.) Here, there was no evidence that any entrance to one of respondents' stores possessed the characteristics of a public forum. The fact that the common areas of the shopping center where respondents' stores are located may serve as the functional equivalent of a public forum does not alter the nature of the "particular location" immediately surrounding respondents' stores. (*Ibid.*)

Indeed, neither *Pruneyard* nor its progeny has ever characterized an individual retailer as a public forum. The focus of the *Pruneyard* decision was on balancing the constitutional guarantees of speech and petition against private property rights. (*Pruneyard, supra,* 23 Cal.3d at pp. 908–911.) In striking the appropriate balance, the court stated: " 'As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citation] would not markedly dilute defendant's property rights.' [Citation.]" (*Id.* at pp. 910–911.) The court specifically considered the role of the shopping center in modern society; it noted that increasingly " 'such centers are becoming "miniature downtowns" ' " and cautioned that it was not considering the rights of a different type of property owner, such as the " 'proprietor of a modest retail establishment.' " (*Id.* at p. 910 & fn. 5.) In affirming the *Pruneyard* decision, the United States Supreme Court similarly highlighted the public nature of the shopping center in balancing the respective rights at issue, describing Pruneyard as "a large commercial complex that covers several city blocks, contains numerous separate business establishments, and is open to the public at large." (*Pruneyard Shopping Center v. Robins, supra,* 447 U.S. at p. 83.) Moreover, Justice White's concurrence emphasized the limited nature of the California Supreme Court's holding, which dealt with "the public or common areas in a large shopping center and not with an individual retail establishment within or without the shopping center or with the property or privacy rights of a homeowner." (*Id.* at p. 95 (conc. opn. of White, J.).)

We decline to extend the holding in *Pruneyard* to the entrance and exit area of an individual retail establishment within a larger shopping center. Appellants' evidence concerning the public nature of certain shopping centers' common areas failed to raise a triable issue of fact as to whether apron and perimeter areas at the entrances and exits of respondents' stores served as public fora. In view of the undisputed evidence that those particular areas lacked any public forum attributes, the trial court properly concluded that any societal interest in using respondents' stores as fora for exercising expressive activities did not outweigh respondents' interest in maintaining control over the use of their stores.

## DISPOSITION

The judgment is affirmed. Respondents to recover their costs on appeal.

Boren, P. J., and Ashmann-Gerst, J., concurred.