Filed 7/2/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| CENTER FOR BIO-ETHICAL REFORM, INC., et al., <br><br>    Plaintiffs and Appellants, <br><br>        v. <br><br> THE IRVINE COMPANY, LLC, <br><br>    Defendant and Respondent. | G055842 <br><br> (Super. Ct. No. 30-2015-00786580) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge. Affirmed in part, reversed in part, and remanded with directions.

American Freedom Law Center, Robert J. Muise and David Yerushalmi for Plaintiffs and Appellants.

Bewley, Lassleben & Miller and Ernie Zachary Park for Defendant and Respondent.

In this case we consider whether certain restrictions applicable to noncommercial speech and expressive activities at two large outdoor retail centers owned by defendant and respondent The Irvine Company, LLC (Defendant) are constitutional under the free speech protections established in article I, section 2 of the California Constitution. The trial court concluded some of the challenged restrictions were unconstitutional and enjoined their enforcement. But it upheld restrictions on (1) "grisly or gruesome displays," (2) the locations in which speech and expressive conduct may occur, and (3) the use of body-worn cameras while engaging in such activities.

We hold there is no constitutional deficiency in the latter two restrictions, and the trial court did not err in denying the statutory damages requested by plaintiffs and appellants Center for Bio-Ethical Reform, Inc., and Gregg Cunningham (collectively, Plaintiffs) pursuant to Civil Code section 52.1. The ban on grisly or gruesome displays is a different matter. It is a content-based restriction that does not survive strict scrutiny review. So, we reverse the portion of the judgment finding the restriction on grisly or gruesome displays constitutional, and we remand to the trial court with directions to enter an amended judgment declaring it unconstitutional and enjoining its enforcement.

**FACTS**

Defendant owns various retail centers in California, including the Fashion Island Shopping Center (Fashion Island), in the City of Newport Beach, and the Irvine Spectrum Center (Irvine Spectrum), in the City of Irvine (collectively, the Centers). Both draw a large number of visitors each year, with the former visited by more than 13 million people annually and the latter by more than 15 million annually.

Plaintiffs, self-proclaimed anti-abortion activists, wished to engage in certain picketing activity at the Centers. They believed the parent companies of some of the stores in the Centers "permit[] business entities under [their] corporate control to donate money to Planned Parenthood, [an] abortion provider[,]" and, thus, they desired "to conduct boycott picketing in close proximity to [them.]"

2

Plaintiffs assured Defendant they would conduct their activity in a courteous and peaceful manner, without hindering customer entrance into, and exit from, the stores. In addition to verbal communication, Plaintiffs said they would use professionally designed, printed and fabricated picket signs. The signs would display images, titled as follows: "Living 7 week human embryo moments before abortion"; or "Dead 8 week human embryo moments after abortion."

Defendant gave Plaintiffs its "Rules for Non-Commercial Expressive Activities" at the Centers. Defendant explained, "rules aside, [it was] prepared to accommodate [Plaintiffs]" subject to certain conditions, which included the following: (1) Defendant would "work with [Plaintiffs] to find a suitable location for [them] in visual proximity of the store[s] in question . . ."; (2) Defendant would "provide a table and two chairs for [Plaintiffs]"; and (3) in exchange for these accommodations, Plaintiffs "would agree not to have posters or other signage depicting [their desired] photographs (or comparable ones)." With respect to the latter, Defendant further stated it "would have no objection to [the] images being available at [Plaintiffs'] table as long as they were visible only if patrons came to the table."

Plaintiffs took exception to many of Defendant's rules, including a prohibition on grisly or gruesome pictures or displays, and they disagreed with the conditions on which Defendant premised its accommodation of their proposed activity. They refused to stand behind a table, stating they had "a right to approach patrons who . . . don't come to information tables[,]" and they rejected Defendant's prohibition on displaying large signs with their desired images.

After meeting with Defendant's representatives, Plaintiffs offered and requested approval of an alternative image for their signage display. The alternative image was a quick response code (QR code) which, upon being scanned using smartphone technology, would play for the viewer what Plaintiffs described as a "horrifying abortion video."

Defendant dubbed the QR code image "equally problematic" because, "it . . . [would] invite [its] young patrons (who are quite 'tech savvy') to go find the[] videos." Defendant indicated it would not agree to any terms other than those it suggested in correspondence at the outset of this dispute.

Plaintiffs sued alleging Defendant's rules and actions violated their free speech rights guaranteed by Article I, section 2 of the California Constitution. They alleged the ban on grisly or gruesome depictions was an unconstitutional content-based restriction, and the rule restricting expressive activity to a 100 square foot area was unconstitutional because it unreasonably precluded them and others from reaching their target audiences. The complaint sought declaratory and injunctive relief, as well as statutory damages pursuant to Civil Code section 52.1.

During the pendency of the litigation, Defendant revised its noncommercial speech activity rules twice. The first revisions included an increase in the size and number of designated areas within which such activity could occur. The second revisions included an increase in the maximum number of people allowed at one time in each designated area. But the general prohibition on "grisly or gruesome displays" remained through both revisions.

Although Plaintiffs filed a first amended complaint challenging the first revised rules, they did not do so with respect to the second revised rules. The first amended complaint also challenged Defendant's refusal to allow Plaintiffs to wear "body cameras" while engaging in their desired activities—a desire raised by Plaintiffs for the first time after they filed their original complaint.

Following written briefing and a trial at which both parties presented evidence, the trial court ruled partially in favor of Plaintiffs and partially in favor of Defendant. The court found the ban on "grisly and gruesome displays" was an unconstitutional content-based restriction, as applied to the "Living 7 week human embryo moments before abortion" sign and the QR code sign.

4

However, citing *H-CHH Associates v. Citizens for Representative Government* (1987) 193 Cal.App.3d 1193 (*H-CHH*), the trial court found the ban on grisly and gruesome displays was a constitutional content-based restriction, as applied to the "Dead 8 week human embryo moments after abortion" sign.  The trial court also found Defendant's designation of limited areas for expressive activity was constitutional.  Regarding the proposed use of body cameras, it found Plaintiffs "do not have a constitutional right under Article I, § 2 of the California Constitution to videotape patrons of the [c]enters to whom [they] are expressing their opinions."  Lastly, it denied Plaintiffs' claim for statutory damages under Civil Code section 52.1.

## DISCUSSION

Plaintiffs contend the trial court erred by:  (A) concluding the prohibition on "grisly or gruesome" imagery is constitutional on its face and as applied to their post-abortion image; (B) finding the designated free speech area restrictions are constitutional; (C) upholding Defendant's proscription on the use of body cameras by Plaintiffs while engaging in their desired activities; and (D) denying Plaintiffs' claim for statutory damages under Civil Code section 52.1.  We will discuss each contention in turn, but we begin with an overview of the applicable free speech analytical framework.

A.  *Free speech under the California Constitution*

"Article I, section 2, subdivision (a) of the California Constitution declares: 'Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press.'  [Forty] years ago, in *Robins v. Pruneyard Shopping Center* [(1979)] 23 Cal.3d 899, 910 (*Pruneyard*), [the California Supreme Court] held that this provision of our state Constitution grants broader rights to free expression than does the First Amendment to the United States Constitution by holding that a [privately owned] shopping mall is a public forum in which persons may exercise their right to free speech under the California Constitution.  [The Court] stated that a shopping center 'to which the

5

public is invited can provide an essential and invaluable forum for exercising [free speech] rights.' [Citation.] [It] noted that in many cities the public areas of the shopping mall are replacing the streets and sidewalks of the central business district, which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' [Citation.] Because of the 'growing importance of the shopping center [,] . . . to prohibit expressive activity in the centers would impinge on constitutional rights beyond speech rights,' particularly the right to petition for redress of grievances. [Citation.] Accordingly, [*Pruneyard*] "held that the California Constitution 'protect[s] speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned.' [Citation.]" (*Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 857-858 (*Fashion Valley*).)

When faced with a constitutional challenge to a restriction on speech activity occurring in a *Pruneyard* public forum, we must first determine whether the speech activity is protected by the California Constitution. Like its federal counterpart, the California Constitution does not extend to every form of speech or expressive activity. (*Brown v. Entertainment Merchants Assn.* (2011) 564 U.S. 786, 791 (*Brown*); *Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1283 (*Larson*).) Rather, there are "'well-defined and narrowly limited classes of speech'" which are entirely unprotected and, thus, may be restricted or prohibited without raising a constitutional problem. (*Brown,* at p. 791; see *Spiritual Psychic Science Church v. City of Azusa* (1985) 39 Cal.3d 501, 513 (*Spiritual*), disapproved of on other grounds as stated in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 968.) Those categories are obscenity, fighting words, defamation, and speech intended, and likely, to incite imminent lawless action. (*U.S. v. Stevens* (2010) 559 U.S. 460, 468-469 (*Stevens*); *Larson, supra*, 192 Cal.App.4th at p. 1283-1284.)

6

Assuming the speech activity does not fall within one of the unprotected categories, the next analytical step is to determine the level of scrutiny applicable to the challenged restriction. This requires determining whether the restriction is "content-based" or "content-neutral." (*Fashion Valley, supra*, 42 Cal.4th at p. 865.) "'As a general rule, laws that by their terms distinguish favored speech from disfavored speech . . . are content-based. [Citations.]'" (*Snatchko v. Westfield, LLC* (2010) 187 Cal.App.4th 469, 481-482 (*Snatchko*); see *Reed v. Town of Gilbert* (2015) ___ U.S. ___ [135 S.Ct. 2218, 2227, 192 L.Ed. 2d 236] (*Reed*).) Those that cannot be ""justified without reference to the content of the regulated speech,"' or that were adopted by the government 'because of disagreement with the message [the speech] conveys,'" are also considered content-based. (*Reed,* at p. 2227.) "'By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral.' [Citations.]" (*Snatchko,* at pp. 481-482; see also *Clark v. Community for Creative Non-Violence* (1984) 468 U.S. 288, 293.)

Content-based restrictions are "presumptively invalid" and subject to strict scrutiny. (*R.A.V. v. City of St. Paul* (1992) 505 U.S. 377, 382 (*R.A.V*); see also *Reed, supra*, 135 S.Ct. at p. 2226-2227.)[1] To be upheld under strict scrutiny, a restriction must be necessary to serve a compelling government interest and narrowly drawn to achieve that end. (*Reed, supra*, 135 S.Ct. at p. 2227; *Fashion Valley, supra*, 42 Cal.4th at p. 869.) "Narrowly drawn" in such context means it is the "least restrictive means of achieving [the] compelling . . . interest." (*McCullen v. Coakley* (2014) 573 U.S. 464, 478 (*McCullen*).) This is an extremely demanding standard. "'It is rare that a regulation

---

[1] The scrutiny applied to content-based and content-neutral regulations under the liberty of speech clause in the California Constitution is the same as that applied in the First Amendment context. (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 364 (*Alliance*).)

restricting speech because of its content will ever be permissible.'" (*Brown, supra*, 564 U.S. at p. 799.)

In contrast, a content-neutral restriction—i.e., one which concerns the time, place, or manner of speech—is subject to intermediate scrutiny. (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 791 (*Ward*).) The restriction must (1) be narrowly tailored, (2) serve a significant government interest, and (3) leave open ample alternative avenues for communication of the information. (*Ibid.*) In this situation, "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" (*Id.* at p. 798.) It "need not be the least restrictive or least intrusive means[.]" (*Ibid.*)

B. *"Grisly or gruesome" imagery*

With the above framework in mind, we consider Plaintiffs' contention the trial court erred in concluding the restriction on signs depicting "grisly or gruesome" imagery is constitutional. Plaintiffs argue the restriction is content-based and does not withstand strict scrutiny. We agree.

The initial version of the restriction stated: "Signs shall not contain words which are of an inflammatory nature, obscene, or are fighting words that contain gruesome pictures or displays." The second version stated: "No writing, picture, or illustration – whether on a sign, poster, placard, banner, handbill, pamphlet, button, clothing, or otherwise – may contain or depict 'fighting words,' obscenities, pornography, grisly or gruesome displays, highly inflammatory slogans reasonably likely to provoke violence, or racial, religious, or ethnic slurs." This same language remained unaltered in the third version of the restriction.

All three versions of the restriction are content-based on their face as they draw the line between what is, and what is not, allowed based on the content of what is depicted. (*Reed, supra*, 135 S.Ct. at p. 2227; *Snatchko, supra*, 187 Cal.App.4th at pp. 481-482.) If a depiction is "grisly or gruesome" it is banned. If instead, for example, a

8

depiction is beautiful or pleasant, it is allowed. These value judgments are precisely what our Constitution protects against. (See *International Society for Krishna Consciousness of California, Inc. v. City of Los Angeles* (2010) 48 Cal.4th 446, 454 ["'The constitutional right of free expression . . . "is designed and intended to remove governmental restraints from the arena of public discussion"'"]; *City of Fresno v. Press Communications, Inc.* (1994) 31 Cal.App.4th 32, 42 ["The possibility that speech may be 'undesirable' or 'unpopular' is not an acceptable basis for the government to curtail speech which is otherwise protected"].)

Defendant insists the grisly or gruesome restriction is content-neutral because it "simply addresses the manner of communication" and "the style of communication[,]" not the communication itself. We are not persuaded. Not only do the plain words evidence otherwise, but the means by which it would be enforced does so as well. "'[E]nforcement authorities' [must] 'examine the content of the message that is conveyed to determine whether' a violation has occurred. [Citation.]" (*McCullen, supra*, 573 U.S. at p. 479.) This is a classic indication of a content-based restriction. (*Ibid.*; *Best Friends Animal Society v. Macerich Westside Pavillion Property LLC* (2011) 193 Cal.App.4th 168, 184)

*Alliance, supra*, 22 Cal.4th 352, on which Defendant relies, is inapposite. In that case, our Supreme Court held regulations directed at the immediate donation or payment of money—i.e., solicitation—should not be considered content-based. (*Id.* at p. 378.) It came to such conclusion even though the regulation at issue was specifically directed at "aggressive" solicitation. (*Id.* at p. 379.) However, *Alliance* based its conclusion on the history of solicitation regulations and case law "dating back more than 80 years." (*Id.* at pp. 356-357, 378.) No solicitation activity is at issue here, and Defendant provides us with no comparable history or established legal authority concerning the regulation of grisly or gruesome depictions. Further, whereas the adjective in the *Alliance* regulation ("aggressive") described the *manner* in which one

9

might engage in expressive activity, the adjectives in the regulation before us ("grisly" and "gruesome") describe the *content* of material one might desire to display.

The plain words of the grisly or gruesome restriction are not the only reason we conclude it is content-based. The proffered justification supports our conclusion as well. Specifically, Defendant justifies the restriction as protecting minors, including those who come to its family-oriented centers without their parents. As Defendant's representative testified at trial, its concern was that many patrons would find grisly or gruesome images to "be very disturbing." "But '[l]isteners' reaction to speech is not a content-neutral basis for regulation.'" (*Fashion Valley, supra*, 42 Cal.4th at p. 868, citing *Forsyth County v. Nationalist Movement* (1992) 505 U.S. 123, 134; see also *Ward, supra*, 491 U.S. at p. 791 [regulation is content-neutral if it is "'justified without reference to the content of the regulated speech'"].)

Because it is a content-based restriction, Defendant bore the burden of demonstrating it is necessary to serve a compelling government interest and it is the least restrictive means to achieve that interest. (*Reed, supra*, 135 S.Ct. at p. 2227.) A company representative testified at trial the Centers are "family-oriented" centers which draw "small children [and] adolescents, [along with] their parents [and] grandparents[.]" Thus, Defendant asserts the prohibition "shield[s] its younger patrons from . . . grisly [and gruesome] signs[,]" an interest it contends is compelling.

The sole legal support Defendant cites, however, is neither binding on us nor persuasive, nor does it appear to involve strict scrutiny. *H-CHH, supra*, 193 Cal.App.3d 1193, concerned a privately owned shopping mall's restrictions which, among other terms, required management approval for the use of any posters, placards or displays on the mall's premises. (*Id*. at p. 1216.) The appellate court found the requirement unconstitutional because management had unbridled discretion and no objective standards for deciding whether to allow a particular poster, placard or display. (*Ibid*., overruled on other grounds as stated in *Fashion Valley, supra*, 42 Cal.4th at pp.

10

868-869.)  In so concluding, the court stressed it would be possible for the mall to craft the necessary objective criteria.  It offered examples, including the following:  "The use of 'fighting words,' obscenities, grisly or gruesome displays or highly inflammatory slogans likely to provoke a disturbance, of course, could be prohibited.  Examples of the latter would be pictures of aborted fetuses, gross racial caricatures or slogans such as 'kill the pigs now.'"  (*H-CHH,* at p. 1216)

Given the simultaneous reference to "fighting words" and "obscenities," it appears *H-CHH* was attempting to refer to categories of unprotected speech, not speech protected by some level of constitutional scrutiny.  (See *Stevens, supra*, 559 U.S. at pp. 468-469.)  Irrespective of whether the *H-CHH* court's statement was in line with the law at the time it was decided more than three decades ago, recent United States Supreme Court precedent requires we reach a different conclusion.

In *Stevens, supra*, 559 U.S. 460, the United States Supreme Court considered the constitutionality of a statute which criminalized the creation, sale or possession of a depiction of animal cruelty.  (*Id*. at p. 464.)  The government argued depictions of animal cruelty should be treated similar to obscenity and fighting words, meaning the government should be able to prohibit such content without running afoul of free speech rights.  (*Id*. at p. 469.)  Concluding otherwise, the *Stevens* Court underscored that the categories of speech which fall outside constitutional protection are limited and deeply rooted in history.  (*Id.* at p. 468.)  It rejected the notion that categories may be added based on a cost-benefit analysis, and further emphasized that there is no "freewheeling authority to declare new categories[.]"  (*Id*. at p. 472.)

About one year later, the United States Supreme Court again declined to add to the well-established categories of unprotected speech, this time in the context of violent video games.  (*Brown, supra*, 564 U.S. 786.)  Attempting to defend a law which prohibited the sale or rental of violent video games to minors, the government argued that the restricted violence was statutorily defined in a manner similar to how courts identify

11

obscenity, and therefore the regulated expression was not constitutionally protected. (*Id.* at pp. 792-794.) The *Brown* Court rejected the argument as "unprecedented and mistaken." (*Id.* at p. 794.) It explained: "No doubt a State possesses legitimate power to protect children from harm, [citations], but that does not include a free-floating power to restrict the ideas to which children may be exposed. 'Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.' [Citation.]" (*Id.* at pp. 794-795.)

Following *Stevens* and *Brown*, we decline to add grisly and gruesome depictions, directed at minors or otherwise, to the categories of speech which fall outside the scope of constitutional protection. And Defendant wisely does not argue these depictions fall into some other existing category, such as obscenity, fighting words, or speech likely to incite imminent lawless action. (See *Brown, supra*, 564 U.S. at pp. 792-793 ["Our cases have been clear that the obscenity exception . . . does not cover whatever a legislature finds shocking, but only depictions of 'sexual conduct'"]; *Chaplinsky v. New Hampshire* (1942) 315 U.S. 568, 571-572 [fighting words are words that, by their very utterance, inflict injury or tend to incite an immediate breach of the peace]; *Brandenburg v. Ohio* (1969) 395 U.S. 444, 447 [incitement of imminent lawless action].)

This brings us back to the question of whether an interest in protecting minors from viewing grisly and gruesome images is a compelling interest. Here, again, we find *Brown* instructive. In applying strict scrutiny, the *Brown* court reaffirmed that the basis for a compelling interest must be "an 'actual problem' in need of solving." (*Brown, supra*, 564 U.S. at p. 799.) Because the government did not supply any credible studies, research or other evidence demonstrating that exposure to violent video games causes harmful effects in children, the *Brown* court did not find the asserted interest to be compelling. (*Id.* at pp. 800-801.) It also found the prohibition unconstitutionally overinclusive. It recognized the law was an attempt to aid parents in filtering the matters

12

to which their kids would be exposed, but it also acknowledged not all parents care whether their kids play violent video games. (*Id*. at p. 804.)

Similarly, here, Defendant—held to the same standards as a government actor under the circumstances—provides no evidence of the harm that the proscribed depictions would have on minors. We also must recognize some parents may not care whether their kids are exposed to grisly or gruesome images. The lack of evidence and the overinclusiveness forces us to conclude Defendant has not met its burden of justifying the grisly or gruesome restriction.[2]

While current law compels our conclusion, we do not mean to deride the concern underlying the grisly or gruesome restriction. As *Brown* aptly stated: "Our task is only to say whether or not such [prohibited expression] constitute[s] a 'well-defined and narrowly limited clas[s] of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem,' [citation] (the answer plainly is no); and if not, whether the regulation of [it] is justified by that high degree of necessity we have described as a compelling state interest (it is not). Even where the protection of children is the object, the constitutional limits on . . . action apply." (*Brown, supra*, 564 U.S. at pp. 804-805.)

## B. *Designated free speech areas*

Plaintiffs next contend Defendant's restrictions on permissible locations for speech and expressive activity at the Centers are unconstitutional. They concede these restrictions are content-neutral, but argue they are not reasonable. In addition, Plaintiffs assert they unwarrantedly preclude them from being "outside the entrances of the stores they targeted for their boycott activity[,]" locations which they claim are "public fora." We disagree.

---

[2] Because we conclude Defendant did not demonstrate a compelling interest, we do not reach the narrow tailoring component of strict scrutiny.

A series of cases after *Pruneyard* have considered challenges to prohibitions on speech activity outside the entrances and exits of individual stores within malls and shopping centers. (See, e.g., *Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8* (2012) 55 Cal.4th 1083 (*Ralphs*); *Snatchko, supra*, 187 Cal.App.4th 469; *Van v. Target Corp.* (2007) 155 Cal.App.4th 1375 (*Van*); *Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th 106 (*Albertson's*); *Costco Companies, Inc.* (2002) 96 Cal.App.4th 740; *Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425.)

In *Ralphs*, our Supreme Court refined the principles originally set forth in *Pruneyard*. It contrasted mall and shopping center "common areas" with areas immediately adjacent to the entrances of individual stores. (*Ralphs, supra*, 55 Cal.4th at p. 1092.) The former "generally have seating and other amenities producing a congenial environment that encourages passing shoppers to stop and linger, to leisurely congregate for purposes of relaxation and conversation." (*Ibid*.) "By contrast, areas immediately adjacent to the entrances of individual stores typically lack seating and are not designed to promote relaxation and socializing. Instead, those areas serve utilitarian purposes of facilitating customers' entrance to and exit from the stores and also, from the stores' perspective, advertising the goods and services available within." (*Ibid*.)

These differing characteristics led the *Ralphs* court to conclude that to be a public forum under our state Constitution, "an area within a shopping center [or mall] must be designed and furnished in a way that induces shoppers to congregate for purposes of entertainment, relaxation, or conversation, and not merely to walk to or from a parking area, or to walk from one store to another, or to view a store's merchandise and advertising displays." (*Ralphs, supra*, 55 Cal.4th at p. 1093.) Therefore, "the areas outside individual stores' customer entrances and exits, *at least as typically configured and furnished*, are not public forums[.]" (*Id*. at p. 1092, italics added.)

14

Here, the parties dispute the character of Plaintiffs' targeted areas near certain store entrances and exits—as a place for gathering and conversation (i.e., public forum), or a utilitarian walkway and means of store advertising (i.e., nonpublic forum). Plaintiffs' evidence on this point consisted of: (1) photographs of the desired locations at the Centers; (2) photographs of the stores in *Ralph's*; and Cunningham's testimony that Plaintiffs "proposed "to locate [their] activity within close proximity to the storefronts of the targeted stores, getting as close to the entrances as reasonably possible without obstructing [or] disrupting commercial activity, [or] blocking windows[.]"

Plaintiffs photographs demonstrate some difference between the characteristics of the broader area outside store entrances at issue in this case and the area that was the focus in *Ralph's*. The grocery store in *Ralph's* was part of a shopping center in which the retail establishments shared a common parking lot located between them. (*Ralphs, supra*, 55 Cal.4th at p. 1089.) A 15-foot sidewalk separated the parking lot from the sole store entrance area, an area which appears from the photographs to have room for the storage of shopping carts, but no areas for relaxation, gathering and socializing. (*Ibid*.) Here, most of the store entrance areas do not appear to be adjacent to any parking lot or location with vehicle traffic. Rather, most open to the outdoor malls' interior walkways which are relatively spacious, with some of those walkways having a bench or two for seating.

While some of these broader areas in front of the stores do have features that make them more *Pruneyard*-like, we need not determine their precise legal nature because Plaintiffs' target was more focalized. They wished to "get[] as close to the entrances as reasonably possible without obstructing [or] disrupting commercial activity, [or] blocking windows." This matters because the overall character of a mall or shopping center does not drive the *Pruneyard* analysis. Instead, the key is the specific locations at issue in a given situation. (See *Albertson's, supra*, 107 Cal.App.4th at p. 122.)

15

When viewed in this context, Plaintiffs' evidence does not show that their desired locations—"as close to the entrances as reasonably possible"—are any different than the entrance and exit areas considered in *Ralph's* or the other cases discussed and approved of therein. (*Ralphs, supra*, 55 Cal.4th at pp. 1091-1093.) The doorways and the spaces immediately in front and to the sides of the doorways, commonly referred to as the "apron" areas, are purely utilitarian in purpose. They allow people to enter and exit the stores. (*Id.* at p. 1093.) That someone may choose to stop in the apron areas momentarily to talk to another, or pause there to make a phone call, does not render them a public forum to which free speech protections extend. Likewise, the presence of planters and a couple of benches some distance from the store entrances does not change the nature of the doorway and apron areas, nor does the existence of tables, chairs, fountains, and children's play areas elsewhere on the properties. (*Van, supra*, 155 Cal.App.4th at p. 1377; *Albertson's, supra*, 107 Cal.App.4th at p. 122.)

Plaintiffs' challenge to the designated free speech activity areas is equally meritless.[3] Defendant's first set of revised rules provided the following: "'Designated Area(s)' are those area(s) identified as such on Exhibit 1 to the Rules. Except as otherwise provided for herein, Approved Activities must be conducted within one Designated Area." They elsewhere defined the designated areas at Fashion Island and the Irvine Spectrum, respectively, as 10 foot square spaces, and 16 foot by 6 foot spaces, and

[3] Our review on this issue is limited to the first set of revised rules challenged by Plaintiffs in their first amended complaint. The original version of the rules restricted free speech activity at the Centers to an "approximately 100 square foot portion of the Center expressly designated on the attached Exhibit A ('Designated Area')." To the extent Plaintiffs attack the original version of this rule, the record does not contain the referenced attachment, making it impossible for us to evaluate Plaintiffs' argument. (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 ["Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant]".) And although Defendant revised the rules a second time during the pendency of this litigation, Plaintiffs did not challenge the second revised version in their second amended complaint.

16

identified them on attached maps of the properties. Additionally, the revised rules made an exception for activity targeting a particular merchant. In such a situation, if the targeted store was "not in the visual and aural range of a Designated Area, [a person or group] may . . . request an alternate area that [was] within said visual and aural range thereof." So long as the fire marshal determined the alternate area could be safely used for the proposed activity, the person or group would be allowed to use it.

The parties agree this aspect of the rules is content-neutral, thus the focus of our inquiry is whether the limitations are narrowly tailored to a significant government interest, and leave open ample alternative avenues for communication of the information. (*Ward, supra*, 491 U.S. at p. 791.)

Defendant met its evidentiary burden on this point. Its representative testified the locations it designated are those that do not block store entrances or impede pedestrian thoroughfares, and "that are intentionally geared towards public gathering spaces." The designation of multiple areas throughout the properties that are located in the more expansive areas of the outdoor malls, and that avoid the more narrow passageways lined with store entrances, is narrowly tailored to the identified safety and flow management-related interests. This is particularly so because, contrary to Plaintiffs' assertion, the revised rules allow those who wish to "target" certain stores with their expressive activities to locate themselves in the visual and aural range of the stores so long as the fire marshal determines it can be done safely. Between the four to five designated locations, and the option of alternate locations, the revised rules leave open ample alternative locations for people to communicate their messages. (C.f. *Chico Feminist Women's Health Center v. Scully* (1989) 208 Cal.App.3d 230, 246 ["ample alternative channels of communication do not exist if a speaker's target audience is altogether insulated from the speaker's message"].)

Plaintiffs claim the designated areas are "unreasonably small" and "unreasonably restrict[] a picketer's ability . . . to distribute literature[,]" and therefore

17

they "unreasonably restrict[] . . . *the impact* . . . of the expressive activity." But as we already explained, the doorway and apron areas of each individual store are not public fora where free speech activity must be allowed. And Plaintiffs submitted no evidence, for example, that there are other public forum areas at the Centers which the rules preclude them and others from accessing. Constitutional free speech protections "do[] not guarantee an individual the most effective means of communication, only the means to communicate effectively." (*Showing Animals Respect & Kindness v. City of West Hollywood* (2008) 166 Cal.App.4th 815, 825.) This is satisfied when ample alternative means of communication exist, as they do here. (*Ibid.*; see *G.K. Ltd. Travel v. City of Lake Oswego* (9th Cir. 2006) 436 F.3d 1064, 1074-1075, citing *Members of City Council v. Taxpayers for Vincent* (1984) 466 U.S. 789, 812.)

## C. Body cameras

Though Defendant had no official written rule or restriction governing body cameras, it refused to allow Plaintiffs to wear body cameras while engaging in their desired activities. Plaintiffs argue the body camera prohibition is unconstitutional because "[v]ideotaping is a constitutionally protected activity." They reason "[t]he right to free speech includes . . . non-expressive conduct that intrinsically facilitates one's ability to exercise free speech rights[.]" We disagree, based on the record before us and the current state of the law.

Although we recognize there is case law supporting a federal constitutional right to photograph and record matters of public interest, such as government affairs or law enforcement officers engaged in the exercise of their official duties, we find no authority for all encompassing protection of every act of photography or videography. (See, e.g., *Branzburg v. Hayes* (1972) 408 U.S. 665, 681; *Askins v. U.S. Dept. of Homeland Security* (9th Cir. 2018) 899 F.3d 1035, 1044; *Animal Legal Defense Fund v. Wasden* (9th Cir. 2018) 878 F.3d 1184, 1203; *ACLU v. Alvarez* (7th Cir. 2012) 679 F.3d 583, 595-597; *Smith v. City of Cumming* (11th Cir. 2000) 212 F.3d 1332, 1333; but see

18

*True Blue Auctions v. Foster* (3rd Cir. 2013) 528 Fed.Appx. 190, 192-193; *Jones v. Lakeview School Dist.* (N.D.Ohio July 19, 2007, No. 4:06cv630) 2007 WL 2084341, at * 2; *D'Amario v. Providence Civic Center Authority* (D.R.I. 1986) 639 F.Supp. 1538, 1541-1542, aff'd (1st Cir. 1987) 815 F.2d 692.)

More to the point, Plaintiffs have not directed us to any legal authority supporting the existence of an all-encompassing right to videotape under the California Constitution, which is the sole basis for Plaintiffs' challenge, and we have found none.

Even assuming arguendo there were some limited protection under the California Constitution, Plaintiffs' assertions would fail for two reasons. First, Plaintiffs' primary proposed use of body cameras—which they referred to as "security cameras"—is neither inherently expressive nor something which facilitates communication of their speech. They ostensibly wanted to use the body cameras to film passersby in order to "protect [themselves] from any false accusations of harassment [and] making [of] 'disparaging remarks,'" and to deter "bad behavior." But this use of body cameras is pure conduct, which falls outside the bounds of California constitutional protection. (See *Spiritual, supra*, 39 Cal.3d at p. 508 ["The essence of the issue whether an activity falls within the constitutional protection of 'speech' is whether the 'speaker,' by engaging in the activity, is communicating information of any sort"], disapproved of on other grounds in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 968; *Spence v. Washington* (1974) 418 U.S. 405, 410-411 [under federal Constitution, test for determining whether conduct is protected expression asks whether person intended to convey a particularized message and whether it is likely to be understood as communication by the audience under the fact specific circumstances].)

Second, to the extent Plaintiffs claim they desired to use the body cameras to collect video they would later disseminate on various social media platforms, Defendant's prohibition on the use of that particular type of camera is a valid content-neutral "manner" regulation. It is narrowly tailored to Defendant's interest in protecting

19

patrons from intimidation and it restricts but one avenue of communication, leaving Plaintiffs with ample other means of disseminating their message. (See *Ward, supra*, 491 U.S. at p. 791.)

*D. Civil Code section 52.1*

Plaintiffs claim they should have been awarded $25,000 in "statutory damages" pursuant to the Tom Bane Civil Rights Act (Civil Code § 52.1). We are not persuaded.

"Civil Code section 52.1, subdivision (a), provides a private right of action for damages against any person, 'whether or not acting under color of law,' who 'interferes' or 'attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws [of California].'" (*Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 394-395 (*Julian*).) "'[T]he statute was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful.' [Citation.] . . . Speech is insufficient to establish the requisite threat unless it includes threat of violence. [Citations.]"

We find no error in the trial court's denial of Plaintiffs' request for two reasons. First, there is no evidence Defendant used any "threat, intimidation, or coercion[.]" Communicating in writing or otherwise that a person will be treated as a trespasser and removed from property should they choose to engage in certain activities does not amount to the "egregious interference[]" contemplated by the statute. (*Julian, supra*, 11 Cal.App.5th at p. 395; see Civil Code, § 52.1, subd. (k) ["Speech alone is not sufficient to support an action . . . except upon a showing that the speech itself threatens violence against a specific person or group of persons; and [that such] person or group of persons. . . . reasonably fears that, because of the speech, violence will be committed

20

against them or their property and that the person threatening violence had the apparent ability to carry out the threat"].)

Second, even if Plaintiffs could show qualifying acts by Defendant, the $25,000 which they seek would not be available. While Civil Code section 52.1, subdivision (c) provides for the recovery of damages under Civil Code section 52, the $25,000 civil penalty Plaintiffs seek is only available when a person is denied a "right provided by [Civil Code] [s]ection 51.7 or 51.9." (Civ. Code, § 52, subd. (b).) Those rights—e.g., freedom from sexual harassment, and freedom from threats or violence based on, for example, sex, race, color, religion, ancestry, national origin, disability, medical condition, or political affiliation—are not implicated in this case. (See Civil Code, §§ 51.7, 51.9.)

## DISPOSITION

The judgment is reversed as to the prohibition on grisly or gruesome displays only. On remand, the trial court shall enter an amended judgment declaring the prohibition on grisly or gruesome displays unconstitutional and enjoining the enforcement thereof. In all other respects, the judgment is affirmed. Plaintiffs are entitled to their costs on appeal.


THOMPSON, J.

I CONCUR:


IKOLA, J.

21

ARONSON, J., Concurring.

I agree with the majority that grisly and gruesome depictions are not categorically unprotected speech; Defendant's prohibition against grisly and gruesome displays is a content-based restriction subject to strict scrutiny; and Defendant did not carry its burden of demonstrating that restriction serves a compelling government interest and is narrowly tailored.  But I write separately to dispel the notion that protecting young children from psychologically harmful images cannot ever be a compelling state interest.[4] Under certain circumstances, it very well might be.

Both the United States Supreme Court and various California courts have recognized the government has a compelling interest in protecting minors from a variety of harms.  (See *Sable, supra,* 492 U.S. at p. 126 [government may shield minors "from the influence of literature that is not obscene by adult standards" because "there is a compelling interest in protecting the physical and psychological well-being of minors"]; *Ginsberg v. State of New York* (1968) 390 U.S. 629, 639 ["The well-being of its children is of course a subject within the State's constitutional power to regulate"] [regarding statute regulating obscenity for minors]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 ["the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect"] [juvenile dependency case]; *H.S. v. N.S.* (2009) 173 Cal.App.4th 1131, 1142 [state has "compelling interest in protecting the child's well-being"] [child custody case]; *Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1080, 1085 [ordinance prohibiting material "harmful to minors" from being publicly displayed unless blinder

---

[4]      Defendant asserts the prohibition serves the "compelling interest [of] shielding its younger patrons" from grisly or gruesome imagery, citing *Sable Communications of California, Inc. v. F.C.C.* (1989) 492 U.S. 115, 126 (*Sable*) for the notion that the government has "a compelling interest in protecting the physical and psychological well-being of minors."  The majority's opinion does not conclude that can *never* be a compelling interest; it holds only that "Defendant has not met its burden of justifying the grisly or gruesome restriction" on this record.  (Maj. opn. *ante*, at p. 13.)

1

racks cover the lower two-thirds of the material was aimed at "protect[ing] minors from exposure to harmful matter" and thus served a "compelling state interest"].)

Of course, the above cases arose in different factual contexts subject to different standards. However, the *fundamental* notion the government has a compelling interest in protecting minors from harm applies in this context as well. Several out-of-state cases have held as much. (See *Olmer v. City of Lincoln* (8th Cir. 1999) 192 F.3d 1176, 1180 [city had compelling interest "in protecting very young children from frightening images" of aborted fetuses], *overruled in part on different issue by Phelps-Roper v. City of Manchester* (8th Cir. 2012) 697 F.3d 678, 692; *Saint John's Church in the Wilderness v. Scott* (Colo. App. 2012) 296 P.3d 273, 283-284 (*Saint John's*), cert. denie*d* [government has "compelling interest in protecting children from exposure to certain images of aborted fetuses and dead bodies"]; *Bering v. SHARE* 106 Wash.2d 212, 237, 241 (1986) [state has "compelling interest in avoiding subjection of children to the physical and psychological abuse inflicted by the [abortion] picketers' speech" using the words "'kill'" and "'murder'"]; see also *Frye v. Kansas City Missouri Police Dept.* (8th Cir. 2004) 375 F.3d 785, 791, fn. 2 [suggesting in dicta there may exist a compelling interest in protecting minor children from viewing photographs of mutilated fetuses].)

Of course, "'[m]inors are entitled to a significant measure of First Amendment protection,'" and the state lacks "a free-floating power to restrict the ideas to which children may be exposed." (*Brown v. Entertainment Merchants Ass'n.* (2011) 564 U.S. 786, 794 (*Brown*).) But protecting young children from substantial or long-lasting psychological or emotional harm caused by exposure to horrifying and graphic speech may serve a compelling state interest, *assuming* the proponent of the restriction establishes young children would in fact suffer this type of harm.

Here, the image in question is a poster with the words "Dead 8 week human embryo moments after abortion." The image on that poster shows a dead fetus, with its

2

head, face, spinal cord, arms, fingers, and body all visible and identifiable, and with the head clearly *severed* from the body.  Because strict scrutiny applies, Defendant must establish its prohibition on this "grisly and gruesome" image is (1) necessary to serve the compelling interest of protecting the physical and psychological well-being of its younger patrons and (2) the least restrictive means to achieve that interest.  Defendant failed to make this showing.

Although this image conceivably might bother or even traumatize some children, Defendant presented no evidence — no percipient witness testimony, no expert witness testimony, no studies or scientific reviews, or other evidence[5] — on whether, how, or to what extent viewing that image would negatively impact children or whether the negative impact might vary by age group.  Defendant's witness testified the centers are premier family-oriented shopping centers often frequented by young children and adolescents, but Defendant failed to provide any evidence about *why* it considers the centers "family-oriented."  Defendant presented no evidence or data on how often young children are present in the areas in question, at what times they are typically present, what age ranges are most common, or how many children visit either center on a given day.  Nor did Defendant provide evidence on whether the centers contain certain stores,

---

[5]     The trial court apparently thought it was self-evident that the image in question was grisly and gruesome, noting the picture "is gruesome or grisly. . . .  I don't think I need to say why, but it is."  But whether and to what extent something causes harm to children is not always self-evident.  For example, in *Brown, supra*, 564 U.S. at pp. 799-800, the government's evidence at best showed a correlation, but not a "direct causal link," between violent video games and aggressive behavior in minors, and the Supreme Court therefore reasoned the law restricting sale of those games to minors did not serve a compelling government interest.  At some point, however, the harm to young children from viewing *extremely* graphic and morbid images (e.g., depictions of torture or mutilation) is self-evident, and therefore scientific evidence or studies would not be necessary to show causation.  This is not such a case.

restaurants, attractions, rides, or other activities that might hold special attraction for children.

On this limited record, I cannot say Defendant "specifically identif[ied] an 'actual problem' in need of solving . . . [or proved] the curtailment of free speech [is] actually necessary to the solution." (*Brown, supra*, 564 U.S. at p. 799.) Defendant therefore failed to show its restriction served a compelling government interest. To be clear, my "concern in the present case is not with the general proposition that protecting youth is a compelling government interest, but is instead with the record." (See *Operation Save America v. City of Jackson* (Wyo. 2012) 275 P.3d 438, 461 [restraining order against use of images of aborted and dismembered fetuses was unconstitutional where there was "no evidence concerning the injury or potential injury to children from viewing the images displayed"].)

Defendant also failed to establish its restriction is narrowly tailored.[6] To survive strict scrutiny, a restriction must be narrowly drawn to achieve the compelling government interest. (*Brown, supra*, 564 U.S. at pp. 804-805 ["Even where the protection of children is the object, the constitutional limits . . . apply."].) For this reason, "[b]lanket bans on signs with images of aborted fetuses have not survived the narrow tailoring requirement." (*Saint John's, supra*, 296 P.3d at p. 284 [collecting cases].) Defendant's blanket prohibition against grisly and gruesome imagery applies regardless of whether "younger patrons" are present and thus is not narrowly tailored to serving the alleged "compelling interest [of] shielding its younger patrons" from harmful imagery.

---

[6] The majority, while declining to reach the narrow tailoring component of strict scrutiny, observes that "some parents may not care whether their kids are exposed to grisly or gruesome images," a consideration that seemingly addresses whether the restriction is narrowly tailored. (Maj. opn. *ante*, at p. 13.) Whether parents care if their children are exposed to the image in question is not relevant, in my opinion, because Defendant drafted the restriction to achieve the compelling interest of directly protecting children, not to aid parents in supervising what their children may view.

4

Moreover, there are presumably other means of protecting children from harm that are less restrictive of speech.  Because Defendant's restriction against all grisly and gruesome imagery is drawn more broadly than necessary to achieve Defendant's stated interest, it does not pass the strict scrutiny test.


ARONSON, ACTING P.J.