Filed 5/2/25; Certified for Publication 5/20/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JENNIFER RESTIVO,<br>　　　Plaintiff and Appellant,<br>v.<br>CITY OF PETALUMA,<br>　　　Defendant and Respondent. | A169918<br><br>(Sonoma County<br>Super. Ct. No. SCV-270474) |

This is an appeal from a summary judgment in a dangerous condition of public property case (Gov. Code, § 835).[1]  Plaintiff Jennifer Restivo alleges that a wheel of her skateboard caught in a large crack in a residential street, causing her to fall and sustain serious injury to her arm.  The City of Petaluma (city) moved for summary judgment on numerous grounds, including that it had neither actual nor constructive notice of the alleged dangerous condition.  The trial court ruled plaintiff raised no triable issue as to this element of her dangerous condition claim, and that is the sole issue on appeal.  We affirm.

---

[1] All further references are to the Government Code unless otherwise indicated.

# BACKGROUND

At approximately 4:00 p.m. on a weekday in early March 2021, plaintiff was skateboarding on a residential street in Petaluma, Noriel Lane, following her son, who was also skateboarding, on their way to a neighborhood park.[2] Plaintiff, who lived about a block away, had traveled the street "hundreds of times" before. On the afternoon in question, it was clear and sunny, the pavement was dry, visibility was unobstructed, and plaintiff recalls no one else being on the street.

Plaintiff claims the wheels of her skateboard caught in a "deep crack"/"pothole" in the street surface, which "catapulted" her off her skateboard. She describes the crack/pothole as "approximately 6–9 inches in length, 1–2 inches deep, and 4–7 inches wide" and "very clear"—"[i]f you [were] walking . . . , you would see it." Plaintiff also claims, however, she had never before seen the crack/pothole, despite having traveled the street by various means "hundreds of times" before.[3] She recalls no other problems with the street that day.

Plaintiff did not take any photos of the street at or near the time she fell.

---

[2] In the trial court, plaintiff also referred at times to Turtle Creek Way, which is adjacent to Noriel Lane. Apparently, at a bend, the residential street changes names. In her administrative claim filed with the city, plaintiff alleged she "was lawfully riding a skateboard on Turtle Creek Lane . . . when her wheel caught on a portion of uneven pavement and she fell." In her complaint, she similarly alleged the city "negligently maintained the premises at or near 1924 Turtle Creek Way." At her deposition, however, she acknowledged she did not fall on Turtle Creek Way, but on Noriel Lane. Her expert likewise stated the fall occurred on Noriel Lane.

[3] She estimates she had skateboarded on Noriel 10 to 20 times.

Two months later, in May, plaintiff took a number of cell phone photos of the street. The photos show a roadway laced with cracks that have sealant in/on them. Plaintiff is unable to point out the precise spot where she fell and, in the trial court, claimed that was because the city had filled the crack with "slurry."

In August, plaintiff filed a claim with the city alleging a wheel of her skateboard "caught on a portion of uneven pavement" causing her to fall and the city "had sufficient notice of the [dangerous] condition to repair it prior to this incident." In March 2022, plaintiff filed the instant lawsuit against the city, alleging causes of action for negligence and for dangerous condition of public property (§ 835).[4] She alleged the city "negligently maintained the premises" in that it "failed to adequately inspect, maintain[,] and/or make the premises reasonably safe," and "knew or should have known of the dangerous condition prior to Plaintiff's fall, but failed to take any action to repair it or warn Plaintiff thereof."

After discovery, the city moved for summary judgment on numerous grounds, including that the alleged condition was "trivial," that the alleged condition was "open and obvious," that the city had neither actual nor constructive notice of the alleged condition, and that plaintiff's claim was barred by the doctrine of primary assumption of the risk and by recreational immunity.

The city submitted evidence it was unaware of any other incidents or accidents occurring on Noriel Lane at or near where plaintiff fell. It had maintained records of complaints about city streets for more than 10 years, and during that time, received no complaints about Noriel Lane. Plaintiff,

---

[4] Plaintiff has not pursued her common law negligence claim, which the trial court ruled was barred by governmental immunity.

3

herself, acknowledged she had never seen the alleged condition before, despite having traveled along the street "hundreds of times," including during the month prior to her fall.

With respect to plaintiff's claim that the city covered the alleged condition with "slurry" between the time she fell in March and when she took the cell phone photos of the street in May, the city submitted the declaration of its city engineer, Jeff Stutsman, stating there was no basis for this claim. What is depicted in the cell photos of the street is not "slurry," but "crack sealant . . . [for] minor cracks," which is applied to cracks measuring one-half inch in width or less, "to stop water intrusion." "Crack sealant" would not be used to remediate a crack/pothole the size described by plaintiff, i.e., "6–9 inches in length, 1–2 inches deep, and 4–7 inches wide." A different type of repair would be required, such as cold patch, fill, or repaving the road—none of which, according to Stutsman, is shown in plaintiff's May photos. Further, Stutsman could find no work orders or requests for *any* road work on Noriel Lane during the two months between plaintiff's fall and the day she took the cell phone photos. "Slurry seal," in contrast to "crack sealant," is applied to the entire surface of a road and results in the entire roadway being a dark color. Had a "slurry seal" been applied to the residential street in question, the entire surface of the street would have been dark and would not have been the lighter color, or have had the contrasting veins of crack sealant, shown in the photos.

Stutsman went on to state that in June 2021, the city resurfaced the entire length of Noriel Lane, as well as adjacent Turtle Creek Way, with "high volume slurry seal." This work was done pursuant to a 2019 Pavement Management Budget Options Report ("Pavement Management Report") commissioned by the Bay Area Metropolitan Transportation Commission

4

("Metropolitan Transportation Commission"). The commission contracts with vendors to perform inspections of the city's streets and prepare such a report every two years. Based on its inspections, the vendor assigns a pavement condition index ("PCI"), ranging from zero to 100, 100 signifying a newly paved road and zero signifying a failed road. A score of 70 to 100 is considered " 'good,' " 50 to 70 is considered " 'fair,' " and below 50 is considered " 'poor' " or " 'very poor.' " The report assesses street condition on a macro, city-wide level and indicates a street's "approximate remaining life." The road surfacing and maintenance recommendations "are not necessarily meant for actual field conditions, but more for an overall budgeting look at" the city-wide street system. The report, which is a "very high level look" city wide, does not identify specific cracks or potholes in any street. Noriel Lane was given a PCI of 50 and an approximate remaining life of 8.94 years. The report also included numerous appendices and one of these included a number of maps, one of which showed Noriel Lane shaded in orange, indicating "poor" condition.

After the city receives a Pavement Management Report, it conducts its own inspection of the streets to assess the reported conditions and determine what maintenance recommendations are appropriate and feasible within the city's budget. The city accordingly inspected Noriel Lane. It concluded, based on "many other conditions" not considered in the Pavement Management Report, including actual "Street View," that the street was in "[g]ood" to "fair" condition and preventative maintenance in the form of "high volume slurry seal" would sufficiently extend the life of the road within the city's budget. The work was done in June as one of numerous road maintenance projects undertaken under the aegis of the city's own pavement restoration 2020/2021 plan.

5

In opposition, plaintiff submitted a declaration by Zachary M. Moore, a licensed mechanical engineer and "Board-Certified Diplomat in Forensic Engineering," who was retained to "render[] observations, analysis, and opinions surrounding Plaintiff's fall." Relying on plaintiff's description of the street and the crack/pothole, "approximately 6–9 inches long, 1–2 inches deep, and 4–7 inches wide," he opined the condition "created a substantial hazard for any pedestrians and micro mobility device users traversing the subject location." He further opined "the subject defect was difficult to perceive by roadway users" because there "was minimal color differentiation between the subject defect and the adjacent asphalt surface." He was also of the view the May 2021 photos "depicting the crack sealant" show "bubbling, which is likely due to moisture and/or debris in the repair, confirming the defect had a substantial depth prior to the repair (as well as the need for utilizing crack sealant at this location)."

With respect to notice, Moore opined the city "knew or should have known of the unsafe condition." He identified only the following evidence as the support for this opinion: that the Metropolitan Transportation Commission " 'was out there to do their pavement condition index inventory' " (italics omitted) in " 'September 2019' " (italics omitted) and that the city, in undertaking its own assessment, "was in the subject area as early as September 22, 2017, and as late as July 1, 2019."

After issuing a tentative ruling and considering oral arguments, the trial court adopted its eight-page, single-spaced ruling as its final order and granted the city's motion. The court rejected all of the city's arguments in support of its motion on plaintiff's dangerous condition of public property claim except one—that it had no notice of the claimed dangerous condition that assertedly caused plaintiff to fall off her skateboard. The court ruled

6

there was "a triable issue of material fact . . . regarding the size, depth, and width of the defect" and "[w]ithout this, the court cannot find as a matter of law that the defect was trivial, or that it was not dangerous when used with due care." The court likewise ruled it could make no finding that plaintiff "was not, as a matter of law, using due care."

However, as to notice, the court ruled there was no triable issue that the city had actual or constructive notice of the alleged dangerous condition. The court pointed to the evidence that the city had reviewed its records of complaints about the condition of roadways but found none about the alleged dangerous condition. It also pointed to the city engineer's declaration that following its receipt of the 2019 Pavement Management Report, the city had conducted its own inspections of Noriel Lane and Turtle Creek Way, and had any city employee observed a crack/pothole of the dimensions claimed by plaintiff they were required to report it and no such report was made. Plaintiff, said the court, "has not presented any contrary evidence that the City did have actual or constructive notice of a dangerous condition." Rather, she "merely concludes without explanation" that "she has shown that 'negligent omissions' of the City's employees allowed the dangerous conditions to persist" based on Stutsman's "statement that the City was generally aware of cracks in the roadway, that [the Metropolitan Transportation Commission] had inspected the area in September 2019, and that the City knew that the road condition where Plaintiff fell was in poor condition." These general facts, said the court, "do not establish the City's notice of a dangerous condition." In short, plaintiff had "not provided any evidence that would support [a] finding that any City employee had notice of anything more than trivial defects."

7

**DISCUSSION**[5]

Section 835 is part of the Government Claims Act (§ 810 et seq.). That act—originally known as the Tort Claims Act—defines the liabilities and immunities of public entities. (*County of Santa Clara v. Superior Court* (2023) 14 Cal.5th 1034, 1047 & fn. 6; *Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 829 [a public entity "is not liable for injuries except as provided by statute"].) The act's purpose is " 'to confine potential governmental liability to rigidly delineated circumstances.' " (*Brown*, at p. 829.) Section 835 "sets out the exclusive conditions under which a public entity is liable for injuries caused by a dangerous condition of public property." (*Brown*, at p. 829.)

To establish liability under section 835, a plaintiff must prove that, at the time of injury, a dangerous condition existed on public property, that it created a reasonably foreseeable risk of the kind of injury suffered, and that it proximately caused the injury. (*Ducey v. Argo Sales Co.* (1979) 25 Cal.3d

---

[5] Our standard of review is well established: "We review the grant of summary judgment de novo. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476. . . .) '[W]e apply the traditional three-step analysis used by the trial court, that is, we (1) identify the pleaded issues, (2) determine if the defense has negated an element of the plaintiff's case or established a complete defense, and if and only if so, (3) determine if the plaintiff has raised a triable issue of fact.' (*Meddock v. County of Yolo* (2013) 220 Cal.App.4th 170, 175. . . .) We 'consider[] all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports.' (*Merrill*, at p. 476.) 'Because a summary judgment denies the losing party its day in court, we liberally construe the evidence in support of that party and resolve doubts concerning the evidence in that party's favor.' (*Creekridge Townhome Owners Assn., Inc. v. C. Scott Whitten, Inc.* (2009) 177 Cal.App.4th 251, 255. . . .)" (*Kabat v. Department of Transportation* (2024) 107 Cal.App.5th 651, 659–660 (*Kabat*).)

707, 716 (*Ducey*).) Section 830 defines a dangerous condition of property as one creating a substantial risk of injury when the property is used with due care. Section 830 extends responsibility for a dangerous condition of public property to include risks from property adjacent to public property when the conditions expose those using the public property to a substantial risk of injury. (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 147–148.) "[A] dangerous condition exists when public property is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself. [Citations.] . . . [P]ublic property has also been considered to be in a dangerous condition 'because of the design or location of the improvement, the interrelationship of its structural or natural features, or the presence of latent hazards associated with its normal use.'" (*Id.* at pp. 148–149, italics omitted.) The fact that an accident occurs is not in and of itself evidence that public property was in a dangerous condition at the time of injury. (§ 830.5, subd. (a).)

A plaintiff must also prove that a public employee's negligence or misconduct created the dangerous condition, or that the public entity had actual or constructive notice of the condition a sufficient time before the injury to protect against it. (*Ducey, supra,* 25 Cal.3d at p. 716; *Kabat, supra,* 107 Cal.App.5th at p. 660; *Martinez v. City of Beverly Hills* (2021) 71 Cal.App.5th 508, 519.) " 'To establish actual notice, "[t]here must be some evidence that the employees had knowledge of the particular dangerous condition in question"; "it is not enough to show that the [public entity's] employees had a general knowledge" that the condition can sometimes occur.' [Citation.] To establish constructive notice, the plaintiff must prove 'the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have

9

discovered the condition and its dangerous character.' (§ 835.2, subd. (b).)" (*Kabat*, at p. 665; *Martinez,* at pp. 519–520.)

Plaintiff maintains she "established that the City was generally aware of cracks in the road's asphalt." In support of this assertion, she points to the 2019 Pavement Management Report commissioned by the Metropolitan Transportation Commission and, specifically, to the appendix of maps, one of which shows Noriel Lane shaded in orange, which indicated "a Pavement Condition Index category" of " 'poor' " "as of January 8, 2020." She also states the city "admit[s]" "that prior to [her] injury, the City applied a 'crack sealant' to the pavement, which simply stops water intrusion and does not fill potholes" (italics omitted) and "subsequent to her injury" the city "finally repaved the street using a slurry seal."

Plaintiff's argument remains devoid of reference to any *evidence* that the city had actual or constructive notice of the dangerous condition, i.e., the crack/pothole that was "6–9 inches in length, 1–2 inches deep, and 4–7 inches wide" that assertedly caused her to fall from her skateboard.

Her sweeping assertion that the city "was generally aware" of cracks in the street does not begin to establish that it had notice of the large crack/pothole on Noriel Lane plaintiff claims caused her to fall. (See *Kabat, supra,* 107 Cal.App.5th at p. 665.)

Nor does the fact that the 2019 Pavement Management Report included an appendix of maps, one of which shows Noriel Lane shaded in orange. (Elsewhere in the report, Noriel Lane was given a PCI rating of 50 putting it in the "fair" category and given an estimated remaining road life of 8.94 years.) The city's evidence that the bi-annual pavement reports provide an *overall* assessment of city streets and do not, for any street, identify specific problems, was uncontradicted. The city engineer explained pavement

10

reports are based on "very generalized" inputs and a "very high level" look at streets "city wide." The report recommendations, generated by a software program called "StreetSaver," "are not necessarily meant for actual field conditions, but more for an overall budgeting look" at expenditures and road life. In short, a street's PCI rating "merely provides a method of quantifying a street's approximate remaining life," and "[o]ften times, the remediation required to extend the life of a street, within the City's budget, is less drastic than that which is recommended by StreetSaver." The city's evidence that after it received the 2019 report, it conducted its own inspection of the identified streets, including Noriel Lane, and city employees who observed any issue or had a concern about a particular street were required to report it but no employee reported any such issue or concern about Noriel Lane, was also uncontradicted.

Nor does the fact the city applied crack sealant to cracks in the street prior to her fall, and applied slurry seal to the entire roadway after she fell, raise a triable issue that the city had notice of the large crack/pothole that assertedly caused plaintiff to fall. The city's evidentiary showing as to crack sealant addressed plaintiff's claim in the trial court that she was unable to point out in her cell photos where she fell because the city had applied slurry to the large crack/pothole. In other words, she claimed the slurry was applied after she fell in March 2021 but before she took the cell photos in May—a contention she has now abandoned. As for the slurry seal that was applied in June 2021, the city's evidence that it was a maintenance application to the entire street pursuant to the street condition review that commenced in 2019 and which included the city's own investigation of city streets, including Noriel Lane, was also uncontradicted, as was its evidence that had any employee observed a large crack/pothole the size plaintiff describes they were

11

required to report it and no employee did so. In short, there is no evidence the slurry seal was applied because the city had prior notice of any dangerous condition on Noriel Lane, let alone the large crack/pothole that assertedly caused plaintiff's fall.[6]

Plaintiff grounds her constructive notice argument—that even if the city "did not have actual notice of a particular defect in that street," it "had sufficient time to discover it and remedy it"—on two cases. Neither calls for reversal of the summary judgment.

The first is *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200 (*Ortega*). In that case, our Supreme Court determined "under what circumstances, if any, a store owner may be liable for injuries to a business invitee from a dangerous condition on its premises where the evidence fails to show how long the dangerous condition existed prior to the injury." (*Id.* at p. 1203.) The plaintiff had slipped on a puddle of milk next to the refrigerated dairy section of the store but presented no evidence as to when the spill occurred or when any store employee last inspected that section of the store. The manager admitted, however, the spill could have been on the floor for up to two hours before any employee saw it. (*Id.* at p. 1204.) The jury returned a verdict for the plaintiff. The Court of Appeal affirmed, ruling the plaintiff "could be relieved of his burden of showing how long the milk remained on

---

[6] Plaintiff also points out she testified at her deposition that "cyclists and pedestrians had fallen over the years due to the rough and uneven roads prior to their repair." She acknowledged, however, she, herself, had never observed anyone fall in the street. In any case, her sweeping assertion, lacking in specifics, does not raise a triable issue that the *city* had actual or constructive notice of the "approximately 6–9 inches long, 1–2 inches deep, and 4–7 inches wide" crack/pothole that assertedly caused plaintiff to fall from her skateboard.

the floor if he demonstrated the site had not been inspected within a reasonable period of time." (*Id.* at pp. 1204–1205.)

The Supreme Court agreed. It explained: "A store owner exercises ordinary care by making reasonable inspections of the portions of the premises open to customers, and the care required is commensurate with the risks involved. [Citation.] If the owner operates a self-service grocery store, where customers are invited to inspect, remove, and replace goods on shelves, 'the exercise of ordinary care may require the owner to take greater precautions and make more frequent inspections than would otherwise be needed to safeguard against the possibility that such a customer may create a dangerous condition by disarranging the merchandise' and creating potentially hazardous conditions." (*Ortega, supra,* 26 Cal.4th at p. 1205.) Because the "owner must inspect the premises or take other proper action to ascertain their condition, and if, by the exercise of reasonable care, the owner would have discovered the condition, he is liable for failing to correct it." (*Id.* at p. 1207.)

The high court then turned to what evidence can create "an inference" the owner failed to make an inspection within a reasonable period of time. It agreed with Courts of Appeal that had held "if a plaintiff can show the owner did not make an inspection within a time period that was reasonable under the circumstances, the plaintiff could raise the inference that the defective condition existed long enough so that the failure to discover it was not reasonable." (*Ortega, supra,* 26 Cal.4th at pp. 1208–1209.) The court went on to explain the " 'exact time the condition must exist before it should, in the exercise of reasonable care, have been discovered and remedied, cannot be fixed, because, obviously, it varies according to the circumstances. A person operating a grocery and vegetable store in the exercise of ordinary care must

13

exercise a more vigilant outlook than the operator of some other types of business where the danger of things falling to the floor is not so obvious.' [Citation.] As we have discussed . . . , even though plaintiff did not present evidence of the length of time the milk was on the floor, the general manager, in fact, testified that the milk could have been on the floor for as long as two hours, and at best the floor was not inspected for 15 to 30 minutes. . . . [I]n this case, the evidence . . . creates a reasonable inference that the dangerous condition existed long enough for it to be discovered by the owner." (*Id.* at pp. 1210–1211.) "[T]he inference," said the court, is "based on an important policy that places a premium on maintenance, a crucial factor in the storekeeper's duty to take precautions and make more frequent inspections when encouraging customers to inspect and handle the merchandise." (*Id.* at p. 1211.)

The instant case bears no similarity to *Ortega*. It does not involve a store owner's liability to a business invitee. More importantly, the evidence concerning the inspection and maintenance of the city's streets is not remotely akin to the evidence in *Ortega* concerning the timing of store employees' inspection of an aisle in front of a self-serve dairy section. Here, the city presented undisputed evidence that the condition of its streets is overseen by the Metropolitan Transportation Commission and is evaluated every two years both by a vendor hired by the commission and, independently, by the city. In conducting the city's inspection, employees are required to report any significant problem or concern they observe, and no reports were made about Noriel Lane. Not only did plaintiff present no contrary evidence, she also presented no evidence that the inspection

14

schedule governed by the Metropolitan Transportation Commission is unreasonable.[7]

As we have recited, all plaintiff's expert said about notice was that the city "knew or should have known of the unsafe condition," pointing to the fact the Metropolitan Transportation Commission " 'was out there to do their pavement condition index inventory' " in " 'September of 2019' " and that the city, in undertaking its own assessment, "was in the subject area as early as September 22, 2017, and as late as July 1, 2019." As we have discussed, neither fact raises a triable issue that the city had actual or constructive notice of the large crack/pothole that assertedly caused plaintiff to fall. (See *Kabat, supra,* 107 Cal.App.5th at p. 666 [plaintiff's expert's assertions that " '[Caltrans's] passive accident-based system of determining traffic control safety measures is inadequate to provide [Caltrans] and the City with sufficient notice of this dangerous condition' " and there was " 'no evidence . . . that either [Caltrans] or the City queried the . . . databases at any time before the subject accident occurred,' " did not raise a triable issue that Caltrans had notice of the alleged dangerous condition resulting from the siting of a crosswalk].) " 'A party " ' "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." ' " ' (*Menges v. Department of Transportation* (2020) 59 Cal.App.5th 13, 23. . . .) Nor can it ' "manufacture a triable issue of fact through use of an expert opinion with

---

[7] Likewise, there is no merit to plaintiff's unsupported argument that the city lacked a "formal inspection policy" and a jury could find this "lack" and "inadequate maintenance practices" "contributed" to the city's "failure to discover" the dangerous condition that assertedly caused her to fall. The city indisputably did have an inspection policy—tied to the commission's inspection and bi-annual reports on the city's street system.

15

self-serving conclusions, devoid of any [basis], explanation or reasoning." ' "
(*Ibid.*)

The second case on which plaintiff relies is *Getchell v. Rogers Jewelry* (2012) 203 Cal.App.4th 381. In that case, the Court of Appeal considered whether the evidence submitted in opposition to a motion for summary judgment would permit a "reasonable inference that the dangerous condition," a puddle of jewelry cleaning solution, "was caused by the negligence of one of defendant's employees." (*Id.* at pp. 382–383.) If so, the defendant would, by virtue of the respondeat superior doctrine, be deemed to have notice of the dangerous condition. (*Ibid.*) The trial court granted summary judgment on the ground the plaintiff had not presented any evidence as to how the cleaning solution got on the floor. (*Id.* at p. 384.) The Court of Appeal reversed, pointing out the plaintiff had "submitted evidence that the break room where the accident occurred and the cleaning solution which caused the accident were under the exclusive control of defendant and its employees. He also presented evidence that he did not cause the cleaning solution to be on the floor. Based on this evidence, it reasonably could be inferred that defendant's employees caused the dangerous condition." (*Id.* at p. 386.) And, if so, knowledge of the condition would be "imputed to defendant." (*Ibid.*)

The instant case also bears no similarity to *Getchell*. It does not involve use of the respondeat superior doctrine to impute notice of a dangerous condition created by an employee to the premises owner. Indeed, plaintiff never alleged that the large crack/pothole that assertedly caused her to fall was created by a city employee. Plaintiff asserts she raised such a claim in her opposition to the city's motion for summary judgment. However, it is well established that the operative pleading frames the issues for

16

purposes of summary judgment and a defendant need address only the claim(s) alleged and need not anticipate new, unpled claims. (See *Van v. Target Corp.* (2007) 155 Cal.App.4th 1375, 1387 [" '[A] summary judgment motion is directed to the issues framed by the pleadings. [Citations.] Those are the only issues a motion for summary judgment must address. [Citations.]' [Citation.] . . . '[A] party cannot successfully resist summary judgment on a theory not pleaded [citations]. . . .' . . . [A]n 'appellant may not defeat a summary judgment motion by producing evidence to support claims that are outside the issues framed by the pleadings' "].)[8]

In sum, the trial court correctly ruled the city carried its burden to present evidence it had neither actual nor constructive notice of the dangerous condition that assertedly caused plaintiff to fall off her skateboard, and plaintiff presented no evidence in opposition that raised a triable issue of

---

[8] We note the evidence here also bears no similarity to the evidence in *Briggs v. State of California* (1971) 14 Cal.App.3d 489, a case which plaintiff did not cite, but in which the appellate court upheld a verdict for the plaintiffs in a dangerous road condition case. In that case, the plaintiffs' decedent died in a collision where a mudslide blocked part of the roadway. The court rejected the state's lack of notice argument given evidence that over the preceding 10 days the state had repeated notice of slide activity in the area, earlier in the evening state workers had been at the site dealing with additional slippage and had placed inadequate signage and ineffective pot torches in the area, and only hours prior to the early morning crash, deputy sheriffs had "over the radio" reported slide activity encroaching on the roadway. (*Id.* at pp. 491–493.) "[U]nder the particular circumstances present[ed]"—i.e., "the repeated and visible slippage in the hillside so that the fence was flat and partly hanging in mid-air, the repeated water and mud on the road that forced drivers into the lane of oncoming traffic, and the inadequate signing"—"there was," said the court, "substantial evidence of the existence of a dangerous condition, of which the state had constructive notice, and which it neither remedied nor sufficiently warned against." (*Id.* at pp. 497–498.) No such evidence is present in the instant case.

fact as to this essential element of her dangerous condition of public property claim.

## DISPOSITION

The judgment is affirmed. Respondent to recover costs on appeal.

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Smiley, J.


A169918, Restivo v. City of Petaluma

19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| JENNIFER RESTIVO,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF PETALUMA,<br><br>    Defendant and Respondent. | A169918<br><br>(Sonoma County<br>Super. Ct. No. SCV-270474) |

THE COURT:

    The opinion in the above-entitled matter, filed on May 2, 2025, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.


Dated: _____

                                                    _____

                                                          Humes, P. J.

Trial Court: Sonoma County Superior Court

Trial Judge:      Hon. Patrick M. Broderick

Counsel:

Vaziri Law Group, Aaron Gerhard Miller, Matthew Morgan
Taylor, Karanvir Singh Gill, Luis J. Garcia and Mark Joseph
Nagel for Plaintiff and Appellant.

Eric W. Danly and Jordan M. Green, City Attorneys; Orbach,
Huff & Henderson, Mitchell Green, Kevin E. Gilbert and
Nicholas Daniel Fine for Defendants and Respondents.